653 F.2d 836
 John E. RENNIE, Plaintiff on behalf of himself and all
others similarly situated, Caroline Mauger, Eugenio Burgeos,
Leon Rossi, Hazel Moncrief, Ernie Welker, Mary Jane Weiss,
Margaret Mary McGrath, Joseph Kamienski, Intervenors, on
behalf of themselves and all others similarly situated,
Appellants/Cross-Appellees,
v.
Ann KLEIN, Commissioner, Department of Human Services;
Michail Rotov, M. D., Director of the Division of Mental
Health and Hospitals; Max Pepernik, M. D., Acting Medical
Director at Ancora Psychiatric Hospital; Robert Wallis,
Chief Executive Officer at Ancora Psychiatric Hospital;
Engracio Balita, Consuelo Santos, Victor Ivanov, Gerald
Abraham, Assistant Medical Directors at Ancora Psychiatric
Hospital, Appellees/Cross-Appellants.
 Nos. 79-2576, 79-2577.
 United States Court of Appeals,
Third Circuit.
 Argued April 22, 1980.
Reargued En Banc May 12, 1981.
Decided July 9, 1981.
As Amended July 20, 1981.
 
 John J. Degan, Atty. Gen. of N. J., Stephen Skillman, Asst. Atty. Gen., Steven Wallach (argued), Deputy Atty. Gen., Trenton, N. J., for appellees/cross-appellants.
 Stanley C. Van Ness, Public Advocate, Sheldon Gelman, Asst. Deputy Public Advocate (argued), Trenton, N. J., for appellants/cross-appellees.
 Joel I. Klein, Ellen S. Silberman, Susan L. Carney, Rogovin, Stern, & Huge, Washington, D. C., for amicus curiae, American Psychiatric Assn.
 Christopher A. Hansen, Robert M. Levy, Mental Patients' Rights Project, New York Civil Liberties Union, New York City, Robert Plotkin, Mental Health Law Project, Washington, D. C., for amici curiae American Orthopsychiatric Assn., Mental Health Association, Am. Civil Liberties Union of N. J., Alliance for the Liberation of Mental Patients.
 Argued April 22, 1980 before ALDISERT, WEIS and GARTH, Circuit Judges.
 Reargued In Banc May 12, 1981 before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.*
 
 
 1
 This appeal requires us to define the legal rights of the mentally ill with respect to the care and treatment supplied by the state. We hold that mental patients who are committed involuntarily to state institutions nevertheless retain a constitutional right to refuse antipsychotic drugs that may have permanently disabling side effects. The state may override that right when the patient is a danger to himself or others, but in non-emergency situations must first provide procedural due process. We further determine that the informal administrative procedures established by New Jersey meet constitutional standards, and accordingly, modify a district court injunction that required a formal adversary hearing and other measures before a patient's refusal can be overriden.
 
 
 2
 John Rennie has been a patient at the Ancora Psychiatric Hospital, a state institution in New Jersey, on numerous occasions since 1973. In several instances, powerful antipsychotic drugs have been administered to him against his will. He brought suit in the district court alleging several violations of his constitutional rights and later amended the complaint to assert a class action. The district court defined a qualified constitutional right to refuse treatment and issued a preliminary injunction directing New Jersey to establish an independent review mechanism that went beyond procedures already prescribed by the state.
 
 
 3
 Rennie is a forty year old divorced man, a former pilot and flight instructor. In 1971 he first showed symptoms of mental illness, which became more serious in 1973 when his twin brother was killed. Shortly thereafter, Rennie was admitted for the first time to Ancora, one of five hospitals for the mentally ill operated by the state of New Jersey. He was depressed and suicidal and was diagnosed as a paranoid schizophrenic. At various times during his stays, Rennie refused to accept prescribed drugs despite the hospital staff's insistence that it has a right to medicate him against his will. During his twelfth admission to Ancora, which began in August 1976 after an involuntary commitment proceeding, Rennie instituted the suit that is the subject of this appeal.
 
 
 4
 Rennie's complaint charged the defendants with violating a number of his constitutional rights.[1] By agreement of the parties, the litigation has focused exclusively on motions for preliminary injunctions with respect to the right to refuse treatment, leaving other issues for future determination.
 
 
 5
 After evidentiary hearings and other proceedings lasting almost a year, the district court issued its first opinion, which recognized a qualified constitutional right to refuse treatment. Rennie v. Klein, 462 F.Supp. 1131, 1144-45 (D.N.J.1978). The court held that four factors determine whether treatment may be refused: (1) the physical danger posed by the patient to other patients and the staff at the institution; (2) the patient's mental capacity to decide on his course of treatment; (3) the availability of less restrictive treatments; and (4) the risk of permanent side effects from the medication. See id. at 1145-46.
 
 
 6
 Finding that its hearings satisfied procedural due process insofar as Rennie was concerned, the court, nevertheless, felt it "appropriate to comment on ... the shortcomings of the state's new Bulletin 78-3 regarding psychotropic medication."[2] Id. at 1142. The state's failures to provide for an attorney and independent psychiatrists to assist the patient in asserting his right to refuse treatment were particularly faulted. Id. at 1147.
 
 
 7
 Rennie later moved to amend his complaint to include class action allegations.[3] The district court granted this motion and conditionally certified three subclasses. The first consists of persons who are or may be hospitalized at Ancora and asserts violations of the right to adequate treatment and safe confinement. The claims of this group have not yet been determined.
 
 
 8
 The second subclass consists of all adult patients involuntarily committed to any of the five state mental health facilities Ancora Psychiatric Hospital, Marlboro Psychiatric Hospital, Trenton Psychiatric Hospital, Greystone Park Psychiatric Hospital, and the Glen Gardner Center for Geriatrics. The third subclass is composed of all adult patients voluntarily committed to these five institutions.[4]
 
 
 9
 Further proceedings focused on the motions by the latter two subclasses for a preliminary injunction to enforce a right to refuse treatment. Seventeen days of additional hearings were held and an opinion was issued on September 14, 1979. Rennie v. Klein, 476 F.Supp. 1294 (D.N.J.1979). The district court reaffirmed its earlier conclusion that involuntarily committed patients have a substantive constitutional right to refuse medication and extended this right to voluntarily committed patients. The opinion concentrated, however, not on the substantive aspects of the right to refuse treatment, but on its procedural features.
 
 
 10
 The court ruled that the procedures promulgated in Administrative Bulletin 78-3 were insufficient to protect the substantive constitutional right it had recognized. In the district court's opinion, review of the attending psychiatrist's recommendation by the medical director was inadequate because institutional pressures would prevent him from exercising independent judgment. Additionally, the failure to provide procedures for obtaining informed consent, including a written form signed by the patients, was cited. 476 F.Supp. at 1309-10.
 
 
 11
 The court issued a preliminary injunction that requires the state hospitals to hold hearings to determine whether patients may be medicated against their will. The state must also provide a "patient advocate" to represent patients at hearings, and must retain independent psychiatrists to make the ultimate determination at those hearings. In addition, consent forms are mandated and provisions for administering drugs in an emergency are outlined. The staffs are also directed to file monthly reports on implementation of the decree. 476 F.Supp. at 1313-15.
 
 
 12
 The parties cross-appeal from the district court's order.[5] The defendants contend that the district court erred in recognizing a constitutional right to refuse treatment. In the alternative, they argue that the procedures embodied in Administrative Bulletin 78-3 are sufficient to protect any such right.
 
 
 13
 The plaintiffs assert that the relief ordered by the district court is inadequate. They contend that independent psychiatrists retained by and responsible to the Commissioner of the Department of Human Services cannot be the neutral decisionmakers required by the due process clause. Similarly, an attack is leveled against the effectiveness of the system of patient advocates who, likewise, would be retained by and responsible to the defendant Commissioner. Finally, plaintiffs challenge the portion of the court's order that permits a doctor to medicate the patient by declaring him to be "functionally incompetent," a procedure they say can allow the circumvention of the mandatory review of all refusals of medication.
 
 I.
 
 14
 We first consider the appropriate scope of review. Generally, in an appeal from the grant of a preliminary injunction we are limited to determining whether there has been an abuse of discretion, an error of law, or a clear mistake in the consideration of the proof. Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir. 1975). This narrow standard of review springs from the realization that the proof at a hearing for a preliminary injunction is abbreviated and that the trial court, under time pressures, may not have the opportunity for the more mature consideration of issues that is expected in usual adjudications. See United States Steel Corp. v. Fraternal Association of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970).
 
 
 15
 Our review takes into account the factors that the district court considers in ruling on an application for a preliminary injunction. The moving party
 
 
 16
 "must demonstrate that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is a reasonable probability of eventual success on the merits. In addition, the court must weigh the possibility of harm to the nonmoving party as well as any other interested person and, when relevant, harm to the public."
 
 
 17
 The Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 356-57 (3d Cir. 1980), citing Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919-20 (3d Cir. 1974) (footnotes omitted). Here, the court did not expressly weigh the possibility of harm to defendants in implementing the extensive procedural mandate or to the public interest, which is clearly implicated here as well. See e. g., Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 923-24 (3d Cir. 1974).
 
 
 18
 When it is apparent that all the pertinent evidence will be presented in support of the motion for a preliminary injunction, Fed.R.Civ.P. 65(a)(2) permits the court to consolidate the hearings. Before the trial on the class action, plaintiffs' attorney had suggested a consolidation, and during the taking of testimony counsel and the court discussed this alternative on several occasions. Defense counsel approved the concept but stated he lacked the authority to consent. In the absence of clear agreement between the litigants, the court declined to consolidate.
 
 
 19
 The hearings, however, were as extensive as would be expected in the case of a permanent, rather than a preliminary, injunction. In addition, the trial court prepared a comprehensive opinion that demonstrated complete familiarity with the issues and applicable law gained after several hearings in Rennie's individual case. As is apparent, the court's injunction, although labeled as preliminary, is a sweeping and detailed order that imposes substantial, continuing obligations on the state. The decree is not simply a passive prohibition but requires positive action and substantial expenditures by the state to carry out its provisions. The order will have a significant effect on the state budget and on the care and treatment of the institutionalized patients. In these circumstances, it is particularly appropriate to give substantial consideration to the public interest. When these factors are combined with the extensive fact finding and legal research embodied in the district court's opinions, its order requires a more searching review than is customarily provided for preliminary injunctions.
 
 II.
 
 20
 There are essentially two questions presented on this appeal. First, whether compulsory medication of involuntarily committed mental patients violates a liberty interest protected by the fourteenth amendment. Second, if such an interest exists, what procedures must the state follow to protect it.[6]
 
 
 21
 We first address the liberty interest issue, which may be divided into three inquiries: (A) does state law create a liberty interest that is infringed by compulsory medication of involuntarily committed patients; (B) if not by state law, does the Constitution itself create such a liberty interest; (C) if it does, what are the substantive contours of the right to refuse treatment. We consider these matters in turn.
 
 A.
 
 22
 The defendants deny the existence of a liberty interest and refer to a line of Supreme Court cases suggesting that a liberty interest protected by the due process clause must have its origin in "some right or justifiable expectation rooted in state law." Montanye v. Haymes, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). See also Vitek v. Jones, 445 U.S. 480, 488, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980); Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). They argue that New Jersey law does not create a right or justifiable expectation, but to the contrary, affirmatively withholds any such right.
 
 
 23
 In their characterization of New Jersey's statutory law, the defendants are probably correct, for N.J.Stat.Ann. § 30:4-24.2(d)(1) (West 1981), provides in part that "voluntarily committed patients shall have the right to refuse medication." In context, the implication of the statute is that involuntarily committed patients do not have this right and a New Jersey trial court has so held. In re B., 156 N.J.Super. 231, 383 A.2d 760 (1977). Research has not disclosed any New Jersey appellate opinions interpreting the statute, nor has the Supreme Court of that state had occasion to determine the application of the New Jersey constitution or the common law in this situation.[7]
 
 
 24
 State statutes or practices may give rise to a liberty interest that would not otherwise exist. Thus, the Supreme Court has held that although states are not constitutionally mandated to provide parole, Greenholtz v. Nebraska Penal Inmates, 442 U.S. at 7, 99 S.Ct. at 2103; Morrissey v. Brewer, supra, or probation, Gagnon v. Scarpelli, 411 U.S. at 782, 93 S.Ct. at 1759, or good time credits, Wolff v. McDonnell, 418 U.S. at 556-57, 94 S.Ct. at 2974-75, once legislation does provide a right to these benefits, a liberty interest arises that is protected by the due process clause. By contrast, the court has held that where state statutes do not confer on an inmate the right to be incarcerated in any particular prison, but rather give prison administrators unfettered discretion to transfer inmates among different institutions, a prisoner has no liberty interest in remaining at a given location, even if a transfer is to a much more restrictive environment. Meachum v. Fano, 427 U.S. at 228-29, 96 S.Ct. at 2540; Montanye v. Haymes, 427 U.S. at 242-43, 96 S.Ct. at 2547.
 
 
 25
 A determination that a state statute itself does not create a liberty interest, however, is not the end of the inquiry. A liberty interest may flow directly from the United States Constitution itself, despite silence or contrary indication in state law. Were it otherwise, a state's statutory law would occupy a position higher than the Constitution. Thus, it is not correct to say that a liberty interest can only originate in state law. A more accurate statement is that state law can give rise to a liberty interest that would not otherwise exist.
 
 
 26
 In Vitek v. Jones, the Supreme Court considered whether a Nebraska prisoner had a liberty interest in not being involuntarily transferred from a prison to a state mental institution. The Court examined state law with respect to inmate transfers to mental hospitals and concluded that a liberty interest was implicated since the Nebraska statute provided for transfer only when "a prisoner 'suffers from a mental disease or defect' and 'cannot be given proper treatment in that facility.' " 445 U.S. at 483, 100 S.Ct. at 1258, quoting Nebraska Rev.Stat. § 83-180(1) (1976). In the next, and, for our purposes, critical part of its analysis, the Court held that a liberty interest would be implicated even without statutory limitations on such transfers. Id. at 491-94, 100 S.Ct. at 1262-1264. The Court accordingly held that the prisoner's transfer to a mental institution must comply with requirements of procedural due process. Id. at 494, 100 S.Ct. at 1264.
 
 
 27
 It is evident, therefore, that liberty interests may spring from the Constitution itself and can be recognized without regard to state law. Consequently, we reject the defendants' argument that because none is created by state law, plaintiffs have no liberty interest, and next consider whether one was created by the Constitution.B.
 
 
 28
 An individual who has not been committed to a mental institution has a right to refuse medication sought to be administered against his will. The state cannot ignore due process and simply seize a person and administer drugs to him without his consent. The case before us is one step removed, since it involves the right of an individual to refuse treatment after he has been confined to a mental institution. Such a commitment requires a proceeding in conformity with procedural due process which, under New Jersey law, requires the state to prove that "the institutionalization of the patients is required by reason of his being a danger to himself or others or property if he is not so confined." N.J. Civil Practice Rule 4:74-7(f).
 
 
 29
 An involuntary civil commitment in itself entails "a massive curtailment of liberty." Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). We must determine, then, whether, as the state argues, the freedom to refuse medication normally possessed by an individual is extinguished by involuntary civil commitment, or whether the patient "retain(s) a residuum of liberty that would be infringed" by compulsory medication "without complying with minimum requirements of due process." Vitek v. Jones, 445 U.S. at 491, 100 S.Ct. at 1262.
 
 
 30
 We are not persuaded by the state's argument that involuntary commitment takes away all aspects of a person's liberty interest. In our view, the patient's liberty is diminished only to the extent necessary to allow for confinement by the state so as to prevent him from being a danger to himself or to others.
 
 
 31
 The Supreme Court has held that solitary confinement "represents a major change in the conditions of confinement" in a prison setting, Wolff v. McDonnell, 418 U.S. at 571-72 n.19, 94 S.Ct. at 2982 n.19, and that revocation of parole, with a consequent return to prison, represents a loss to the parolee, Morrissey v. Brewer, 408 U.S. at 482, 92 S.Ct. at 2600. A fortiori, compulsory medication of a nonconsenting patient with its serious concomitant risks must be deemed a "major change in the conditions of confinement."
 
 
 32
 The extent to which the plaintiffs' liberty interest is invaded by compulsory medication appears dramatically from the record here. All the antipsychotic drugs induce a variety of disorders of the central nervous system as side effects.[8] Most serious among these is tardive dyskinesia, a potentially permanent disorder. It is "characterized by rhythmical, repetitive, involuntary movements of the tongue, face, mouth, or jaw, sometimes accompanied by other bizarre muscular activity." Rennie v. Klein, 462 F.Supp. at 1138. More common, but less serious than tardive dyskinesia, are akinesia and akathesia. The former can induce a state of diminished spontaneity, physical weakness and muscle fatigue. The latter is "a subjective state and refers to an inability to be still; a motor restlessness which may produce a shaking of the hands or arms or feet or an irresistable desire to keep walking or tapping the feet." Id. Both of these disorders usually disappear either during or shortly after the course of medication. They can sometimes be controlled by anticholinergic or antiparkinsonian medications.
 
 
 33
 A variety of minor physical effects also attend the use of antipsychotics, which "include blurred vision, dry mouth and throat, constipation or diarrhea, palpitations, skin rashes, low blood pressure, faintness and fatigue.... These side effects tend to diminish after a few weeks." Id. (citations omitted). In rare cases the antipsychotic drugs have caused death.[9]
 
 
 34
 The impact of these side effects was highlighted by the testimony of several patients at the institutions. An older woman described involuntary jaw movements as a result of tardive dyskinesia so severe that she could not be fitted with dentures. As a result she is restricted to a diet of ground food. One young woman told of feeling sedated by the antipsychotic drugs to the point where she would sleep most of the day. Others testified to severe discomfort in response to the drugs. 476 F.Supp. at 1301-02.
 
 
 35
 The record convinces us that there is a difference of constitutional significance between simple involuntary confinement to a mental institution and commitment combined with enforced administration of antipsychotic drugs. It implicates the "right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). This intrusion rises to the level of a liberty interest warranting the protection of the due process clause of the fourteenth amendment.
 
 
 36
 In support of a substantive constitutional right to refuse medication, the plaintiffs also point to the first and eighth amendments. They contend that compulsory medication deprives them of freedom of thought protected by the first amendment and constitutes cruel and unusual punishment proscribed by the eighth amendment. See Scott v. Plante, 532 F.2d 939, 945-47 (3d Cir. 1976). The district court rejected these alternative bases, relying instead on the right to privacy protected by the due process clause of the fourteenth amendment. 462 F.Supp. at 1143-44. We believe it is preferable to look to the right of personal security recognized in Ingraham v. Wright, supra.
 
 
 37
 We find the eighth amendment a particularly inappropriate reference point. That provision is directed to preventing excesses in the punishment of those who have been convicted of crime. Failure to provide adequate medical care is a violation of that amendment only if the deprivation is the result of "deliberate indifference" to the serious medical needs of prisoners. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). See also Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976). It is necessary to distinguish the status of prisoners who are legitimately being punished for commission of a crime from that of persons who are mentally ill or retarded through no fault of their own and are innocent of any offenses against society. These people are victims who are entitled to society's assistance and understanding. They do not merit retribution. It is a throwback to a more callous attitude of the past to equate the mentally ill or retarded person's constitutional right of personal integrity to that of criminals. We reject the eighth amendment, therefore, as the proper minimal standard for the treatment of the plaintiff classes.[10] They are entitled to more humane consideration.
 
 C.
 
 38
 Having concluded that the patient has a constitutional right to be free from treatment that poses substantial risks to his well-being, we must consider the scope of that right. Like most rights, it is not absolute, but is limited by other legitimate governmental concerns and obligations. The administration of drugs generally is a recognized adjunct to the treatment of the mentally ill and indeed may be required by the state as a concomitant of its power to commit involuntarily.[11]
 
 
 39
 Under the New Jersey statutes, a person who is mentally ill may not be committed against his will unless he is a danger to himself, others, or property. State v. Krol, 68 N.J. 236, 344 A.2d 289 (1975). He may not constitutionally be confined involuntarily if he is "dangerous to no one and can live safely in freedom." O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). Whether a state may involuntarily commit a person solely because he may need treatment is a question the Supreme Court has not addressed, id. at 573-74, 95 S.Ct. at 2492-93, and one which has evoked serious reservations by the Chief Justice. Id. at 589, 95 S.Ct. at 2500 (Burger, C.J., concurring). That issue, however, is not presented here.
 
 
 40
 The power to confine involuntarily has been justified under either the state police power or the parens patriae theory. Coll v. Hyland, 411 F.Supp. 905 (D.N.J.1976) (three-judge court). The two often overlap. The powers of the state that justify deprivation of a mentally ill person's freedom from confinement are the same sources of authority for administering drugs without the patient's consent. It is obvious, however, that the state's power is not without limits. A person who is committed because of mental illness may neither be detained after that condition ceases, O'Connor v. Donaldson, nor confined more restrictively than necessary. See Romeo v. Youngberg, 644 F.2d 147, 160-61, 166 (3fd Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 2313, 68 L.Ed.2d --- (1981). Thus, without justification, the state could not shackle a mentally ill patient in a damp, unheated, inordinately small cell, when his condition is such that he could freely move about the institution.
 
 
 41
 The deprivation of liberty imposed by the state must not exceed that required by needed care or legitimate administrative concerns. What is at issue here is the administration of drugs psychotropics with the very real possibility of damaging results accompanying their use so that "the cure (c)ould be worse than the illness." Rennie v. Klein, 462 F.Supp. at 1146. To protect the liberty interest in the face of such a threat, the least intrusive infringement is required. Even a convicted prisoner retains a "residuum of liberty" that may not be infringed without due process protections. Vitek v. Jones, 445 U.S. at 491, 100 S.Ct. at 1262. And, as the Court has said, "due process requires that the nature and duration of commitment bears some reasonable relations to the purpose for which the individual is committed." Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972).
 
 
 42
 Much the same reasoning applies to the involuntary administration of antipsychotic drugs. The record demonstrates that these drugs can be valuable in the treatment of certain mental illnesses, relieving symptoms on a short term basis as well as for lengthy periods. Their use often makes it possible to shorten the period of confinement drastically and also makes patients more manageable and, hence, less a threat to others. Thus, both the police power and the parens patriae interests are served.
 
 
 43
 Just as the power to confine is accepted, but its nature limited, so may involuntary administration of drugs be justified only when accompanied by appropriate restrictions. The involuntarily committed patient retains a "residuum of liberty," and he correspondingly retains the right to be free from "unjustified intrusions on (his) personal security." Ingraham v. Wright, 430 U.S. at 673, 97 S.Ct. at 1413. That concept has sometimes been paired with the "least intrusive means" when objections to forced administration of drugs are raised. See e. g., Rogers v. Okin, 634 F.2d 650 (1st Cir. 1980), cert. granted --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981).
 
 
 44
 Even though a person may be mentally ill, and has been properly committed involuntarily, he nonetheless is considered competent to some extent.[12] His constitutional rights to be free from confinement and personal intrusion are necessarily limited by commitment, but they are not totally extinguished. The Constitution is at least as viable behind the walls of a psychiatric hospital as in a prison. See Vitek v. Jones, 445 U.S. at 491-92, 100 S.Ct. at 1262-63; Wolff v. McDonnell, 418 U.S. at 555-56, 94 S.Ct. at 2974.
 
 
 45
 In another context, the Supreme Court said, " 'even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty,' Kusper v. Pontikes, 414 U.S. 51, 58-59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973), and we have required that States adopt the least drastic means to achieve their ends." Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 185, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979) (citations omitted). That view is consistent with the earlier case of Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960):
 
 
 46
 "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose."
 
 
 47
 Id. at 488, 81 S.Ct. at 252 (footnotes omitted).
 
 
 48
 The means chosen to promote the state's substantial concerns must be carefully tailored to effectuate those objectives with minimal infringement of protected interests. See Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). Although in those cases the Court wrote in the setting of legislation affecting voting and first amendment rights, it has applied the same rationale in other circumstances as well. The same philosophy applies in cases implicating a person's "right to be free from ... unjustified intrusions on personal security," Ingraham v. Wright, 430 U.S. at 673, 97 S.Ct. at 1413, especially where, as here, physical and intellectual integrity is threatened by an unduly narrow construction of constitutional rights.[13] It appears that at least thirty-five jurisdictions explicitly or implicitly acknowledge the least restrictive doctrine in their statutes as applicable to treatment or involuntary commitment.[14]
 
 
 49
 It is true that much turns upon the medical and psychiatric facts of each case. That the constitutional standard is closely intertwined with questions of medical judgment, however, cannot defeat the patient's rights, nor require abdication of legal protection. That was made clear in Vitek v. Jones, 445 U.S. at 495-96, 100 S.Ct. at 1264-65, where the Court, recognizing that judges are not trained to make medical diagnoses, nevertheless found that "(t)he medical nature of the inquiry ... does not justify dispensing with due process requirements." See also, Parham v. J.R., 442 U.S. 584, 607, 99 S.Ct. 2493, 2506, 61 L.Ed.2d 101 (1979). Consistent with this is In re K.K.B., Okl. 609 P.2d 747 (1980), where the court discussed the right to refuse antipsychotic drugs, saying, "in a society ruled by laws, social actions that infringe or control individual freedoms must be judged by legal standards." Id. at 751. "(L)iberty includes the freedom to decide about one's own health. This principle need not give way to medical judgment." Id. at 749.
 
 
 50
 The least intrusive means standard does not prohibit all intrusions. It merely directs attention to and requires avoidance of those which are unnecessary or whose cost benefit ratios, weighed from the patient's standpoint, are unacceptable. There must be a careful balancing of the patient's interest with those to be furthered by administering the psychotropic drug.
 
 
 51
 This is not to say that the least intrusive means requires hourly or daily judicial oversight. Obviously that would be an unworkable standard. Rather, what is reviewable is whether the choice of a course of treatment strikes a proper balance between efficacy and intrusiveness. In its search for the correct answer, a court naturally will depend upon medical and psychiatric opinion, just as it does in deciding upon the competency of a defendant to stand trial, the necessity for involuntary commitment, and other similar medical or psychiatric issues.[15] No doubt, some cases will present sharply conflicting professional viewpoints. That, however, is not a valid reason for refusing to make the inquiry.
 
 
 52
 In any event, promulgation of the standard merely serves to advise the psychiatric community that a conscious weighing of the constitutional liberty interest in any determination of proper treatment alternatives is necessary. It will not unduly hamper the standard of professional care to determine whether a different drug, or smaller dosages, or a different therapy would serve the interest of the patient as well as the state.
 
 
 53
 It must be observed that emergency conditions, for example, may require that more discretion be granted the attending physician. In the case of antipsychotic drugs, it would appear that treatment for a limited period is not as likely to have as intrusive an effect upon the patient as administration for an extended time. This, moreover emphasizes that the least intrusive standard is generally applicable to a regimen or treatment program rather than individual dosages. We emphasize that the emergency treatment provisions are not at issue in this case.
 
 III.
 
 54
 Having concluded that a constitutional right to refuse treatment exists, it is necessary to consider whether the due process safeguards imposed by the district court were proper.[16]
 
 
 55
 Initially, we recognize that the decision to administer drugs depends upon a medical judgment based upon a variety of facts, such as the need for the drugs and their probable effects on the patient, including the possibility of side effects. Matters such as the likelihood of violence on the part of the patient; his previous reaction to acute psychotropic drugs, if any; the duration of previous drug therapy; the prognosis for improvement or stability; alternative medications; close confinement or other alternatives; and other factors too numerous to mention here, all enter into the decisionmaking. The nature of these elements makes it plain that the determination must be made on an individual basis. Due process procedures must therefore provide an opportunity for the exercise of professional judgment in these circumstances.
 
 
 56
 From a legal standpoint, the outline of due process protections that must guide state agency proceedings are summarized in Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Court listed three factors for consideration: (1) the private interest; (2) the risk of an erroneous decision through the procedures used as well as the value of the any of additional or substituted safeguards; and (3) the governmental interest, including fiscal and administrative burdens that other procedural requirements would impose. Id. at 335, 96 S.Ct. at 903. These guidelines permit flexibility to adjust to a variety of circumstances, such as the employment of professional judgment, and do not mandate adherence to rigid, traditionally adversary proceedings. Against this background, we turn to the administrative provisions adopted by the State.
 
 
 57
 New Jersey has enacted legislation regulating treatment for the mentally ill. It includes provisions that provide for the right to "medical care and other professional services in accordance with accepted standards ... (and) the right to participate in planning for his own treatment to the extent that his condition permits." N.J.Stat.Ann. § 30:4-24.1 (West 1981). It has also enacted a mental patient "Bill of Rights," which guarantees the right "(t)o be free from unnecessary or excessive medication," the right not to have medication "used as a punishment, for the convenience of staff, (or) as a substitute for a treatment program," and the right to have adequate records of medication maintained. Id. at 4-24.2(d)(1). Administrative Bulletin 78-3, issued soon after this litigation began, incorporates many of the provisions found in the statute and, while not conceding the right of involuntarily committed patients to refuse drugs, also defines the need for compulsory medication. For those not adjudicated incompetent, medication may be imposed involuntarily in some limited, nonemergency situations. If, without it, the patient is incapable of participating in any treatment plan that will give him a realistic opportunity to improve his condition, or if it will shorten the required commitment time, or if there is a significant possibility that the patient will harm himself or others before his condition improves, drugs may be administered. P II(2)(a) & (b).
 
 
 58
 Procedurally, the Bulletin sets up a mechanism through which a decision to administer drugs against a patient's will shall be made and reviewed. At the first level, when a patient refuses to accept medication, the treating physician must explain to the patient the nature of his condition, the rationale for using the particular drug, and the risks or benefits of it as well as those of alternative treatments. If the patient still declines, the matter is discussed at a meeting of the patient's treatment team, which is composed of the treating physician and other hospital personnel, such as psychologists, social workers, and nurses who have regular contact with the patient. The patient is to be present at this meeting if his condition permits. P II(B).
 
 
 59
 If, after the team meeting, the impasse remains, the medical director of the hospital or his designee must personally examine the patient and review the record. In the event the director agrees with the physician's assessment of the need for involuntary treatment, medication may then be administered. P II(D). The medical director is also authorized, but not required, to retain an independent psychiatrist to evaluate the patient's need for medication. P II(E)(1). Finally, the director is required to make a weekly review of the treatment program of each patient who is being drugged against his will to determine whether the compulsory treatment is still necessary. P II(E)(2). In addition, the district court found that the Division of Mental Health and Hospitals had adopted a practice, not incorporated in the Bulletin, of having all cases of compulsory medication reviewed by a division director or another physician in the division's central office. See 476 F.Supp. at 1303.
 
 
 60
 Despite the detailed mechanisms established by Bulletin 78-3, the district court held that the procedures failed to meet due process standards. The judge found that the provisions were not being implemented by the state and that review of medication decisions by the director was not adequate. The court did not "impugn the good faith of the directors, who appear genuinely determined to reduce unnecessary reliance on drugs and to increase the involvement of patients in their own treatment decisions." 476 F.Supp. at 1310. However, "institutional pressures ... make it impossible for anyone in the medical director's position to have sufficient independence, much less the appearance of fairness which due process required." Id.
 
 
 61
 For these reasons, the court expanded on the state's requirement and entered an injunction whose principal provisions:
 
 
 62
 1. Require the hospitals to employ consent-to-receive-medication forms, which advise patients of their right to refuse treatment, their right to have refusal reviewed before it is overridden, and describe "all known short-term and long-term side effects of the drug to be consented to," id. at 1313;
 
 
 63
 2. Require the Commissioner of the Department of Human Services to set up a system of "patient advocates" to represent the patients who wish to refuse treatment. These advocates may be lawyers, psychologists, social workers, registered nurses, paralegals, or other qualified laymen;
 
 
 64
 3. Require the Commission to retain independent psychiatrists to make the ultimate determination by written decision on whether the patient's refusal shall be honored;
 
 
 65
 4. Prohibit hospitals from administering psychotropic medication against a patient's will, other than in an emergency, unless the independent psychiatrist so orders;
 
 
 66
 5. Direct the state to hold a hearing after five days' notice to the patient to determine whether the hospital may medicate him against his will; and
 
 
 67
 6. Order the state to provide a patient advocate to represent the patient at the hearing and to allow the patient to retain an attorney (at the patient's expense) to represent him at this hearing.
 
 
 68
 See 476 F.Supp. at 1313-14.
 
 
 69
 We must now determine whether the district court erred in ruling that Bulletin 78-3 was deficient and whether additional procedures were required to pass constitutional muster. Our task is not to compare the procedures of Bulletin 78-3 with those ordered by the district court, nor to determine which of the two programs is more effective in protecting a patient's right to refuse treatment, nor which is sounder as a matter of policy. Our inquiry is far narrower: do the procedures established by New Jersey satisfy due process? A federal court is not to substitute its judgment for that of state legislative and executive authorities, unless the state's response in protecting the liberty interest falls short of constitutional standards.
 
 
 70
 The first Eldridge factor, that of the private interest implicated in the patient's right of refusal, has already been discussed. We pass, therefore, to the next point, the risk of an erroneous decision. We are satisfied that the state's procedures, if carefully followed, pose only a minor risk of erroneous deprivation. We also are convinced that this risk will not be significantly reduced by superimposing the district court's own requirements on those already required by the state.
 
 
 71
 The decision to compel medication will generally be made by members of the hospital medical staff who have had more connection with the treatment of the individual patient than an independent psychiatrist, whose experience would necessarily be limited to ad hoc situations. The weeks or months that a patient spends in these institutions should provide a more accurate and reliable basis for the staff's judgment as to whether the patient poses a danger to himself or to others and whether he is capable of making a rational treatment decision. See Cruz v. Ward, 558 F.2d 658, 662 (2d Cir. 1977), cert. denied, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765 (1978).
 
 
 72
 The adversary contest implicit in the district court's order is ill-suited to the type of medical determination that must be made. The Supreme Court made this point forcefully in Parham v. J .R., where it wrote that "due process is not violated by use of informal, traditional medical investigative techniques." Id. 442 U.S. at 607, 99 S.Ct. at 2506. The Court acknowledged
 
 
 73
 "the fallibility of medical and psychiatric diagnosis ... (but did) not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real."
 
 
 74
 442 U.S. at 609, 99 S.Ct. at 2507 (citations omitted). We find this reasoning equally applicable to the instant case. If an informal investigation by an admitting physician satisfies due process when the private interest at stake is the "massive curtailment of individual liberty" inherent in civil commitment, such informal procedures meet constitutional standards in the present context.
 
 
 75
 The final phase of our analysis of the second Eldridge factor examines the role of an independent decisionmaker. The district court doubted that doctors and patient advocates who are within the state mental health bureaucracy and who are responsible to the Commissioner of the Department of Human Services can be sufficiently independent to meet constitutional requirements. Although this point is arguable, it has repeatedly been rejected by the Supreme Court in analogous contexts. The Court found no due process violation in the use of decisionmakers employed by and responsible to the state bureaucracies in Vitek v. Jones, 445 U.S. at 496, 100 S.Ct. at 1262; Parham v. J.R., 442 U.S. at 607, 99 S.Ct. at 2506, or in Wolff v. McDonald, 415 U.S. at 570-71, 94 S.Ct. at 2981-82 (decision in prison disciplinary proceedings made by adjustment committee composed of three prison officials).
 
 
 76
 To follow the rationale of the district court would be to void almost all intra-administrative appeals, where institutional pressures abound. We also note that the New Jersey provision for retaining an outside psychiatrist in certain circumstances tends to blunt the district court's concern that institutional pressures will prevent an independent decision. If the medical director desires some method of avoiding those influences, he has the power to call upon a disinterested authority for the final decision.
 
 
 77
 The third Eldridge factor is the government's interest, including the function at stake and the fiscal and administrative burdens that additional procedural requirements would impose. More than either of the first two factors discussed, this element counsels our approval of New Jersey's regulatory system, and consequently, our rejection of the district court's response to the problem. Without question, the district court's order will impose substantial additional financial burdens on the state and even greater expenditures of staff time at the hospitals.
 
 
 78
 The Supreme Court noted in Parham v. J.R., that "psychiatrists, psychologists, and other behavioral ... experts in courtrooms and hearings are of little help to patients." 442 U.S. at 606, 99 S.Ct. at 2506. Moreover, the adversary proceedings contemplated by the district court are more likely to be counterproductive, adding to the tensions that may have contributed to the patient's initial commitment to the institution. The Supreme Court discussed this problem in Parham and remarked that the adversary atmosphere would only create stress, rather than facilitate successful long-range treatment. Id. at 610, 99 S.Ct. at 2508.
 
 
 79
 We are acutely aware of the finite state resources available for the care of the mentally ill. Diversion of these funds to finance nonessential administrative procedures, however beneficial and desirable, will not provide help for the patient's most critical needs.
 
 
 80
 The New Jersey regulations provide a series of informal consultations and reviews to determine from a medical standpoint whether administration of the drugs is necessary. To the extent that other treatment possibilities are discussed and discarded, the process also provides a reasonable exploration of the least intrusive means. Romeo v. Youngberg, supra; Rogers v. Okin, supra. See also, Parham v. J.R., 442 U.S. at 606-13, 99 S.Ct. at 2506-10. The participants in the procedure are mental health professionals, rather than judges who have doffed their black robes and donned white coats. Nevertheless, the regulations and the statutes adequately focus the administrative proceedings on the facts that shape the constitutional standard and thereby protect the patients' interests at stake.
 
 
 81
 We are persuaded, therefore, that the procedures established in Bulletin 78-3 are consistent with constitutional guarantees and the district court erred in applying the appropriate legal standard. Deficiencies in implementing those procedures should be remedied by the district court not by providing additional requirements, but by enforcing those already promulgated through the Administrative Bulletin. Any reluctance that some hospital staff members might have in meeting the standards is unlikely to continue when it becomes apparent that the court is prepared to enforce them. If, after a reasonable time, it develops that the state procedures are not working, then the court may explore other methods to guarantee the patient's constitutional rights. The record as it now stands does not demonstrate that the time for such action has arrived. We conclude, therefore, that the district court erred in engrafting its own procedures onto the requirements set out in Administrative Bulletin 78-3.
 
 
 82
 As noted earlier, it is a preliminary and not a permanent injunction that we modify. The district court retains jurisdiction over these proceedings, and may consider any future charge that the defendants refuse to recognize the constitutional right upheld here or are not complying with the procedures set forth in Administrative Bulletin 78-3 as incorporated in the modified decree. We do not address enforcement further at this point, and leave it for consideration by the district court, if appropriate. Our central concern has been with the procedures adopted by the state and their sufficiency as a matter of due process not with whether those procedures have been breached.
 
 IV.
 
 83
 Since we have determined that the provisions of Administrative Bulletin 78-3 adequately protect the liberty interest of involuntarily committed mental patients who refuse medication, constitutional due process standards have been met.[17] In order to give interim protection to institutionalized patients we will not vacate the decree, but do modify it to incorporate the applicable terms of P II of Administrative Bulletin 78-3. In proceedings after remand, the district court may wish to modify the interim decree in accordance with this opinion or to enter a permanent injunction. A form of decree is attached hereto and is designated as Appendix A.
 
 
 84
 The case will be remanded for further proceedings consistent with this opinion. Each party shall bear its own costs.
 
 APPENDIX A
 
 85
 For reasons stated in the court's opinion filed this day,
 
 
 86
 It is on this ______ day of ______, 1981, hereby ORDERED of defendants Klein and Rotov:
 
 
 87
 I. Defendants shall comply with the following procedures for the adult units of the Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Marlboro Psychiatric Hospital, Trenton Psychiatric Hospital, and Glen Gardner Geriatric Center:
 
 
 88
 II. The Involuntary Administration of Medication Definitions
 
 
 89
 1. A patient is considered incompetent only if he has been adjudicated incompetent by a court.
 
 
 90
 2. Medication is considered a necessary part of a patient's treatment plan when either:
 
 
 91
 (a) The patient is incapable, without medication, of participating in any treatment plan available at the hospital that will give him a realistic opportunity of improving his condition; or
 
 
 92
 (b) Although it is possible to devise a treatment plan that is available at the hospital and will give the patient a realistic opportunity of improving his condition; either:
 
 
 93
 (1) a treatment plan which includes medication that would probably improve the patient's condition within a significantly shorter time period; or
 
 
 94
 (2) there is a significant possibility that the patient will harm himself or others before improvement of his condition is realized, if medication is not administered.
 
 A. Emergency Administration of Medication
 
 95
 The procedures described in this Bulletin are not intended to preclude the administration of psychotropic medication to a patient in an emergency.
 
 
 96
 Therefore, if a physician certifies that it is essential to administer psychotropic medication in order to prevent the death of or serious consequences to a patient, the Chief Executive Officer is authorized to consent to the administration of the medication recommended by the physician's certification. If it is impossible to comply with this procedure without jeopardizing the life of the patient, the medication may be administered on a physician's order.
 
 
 97
 B. If a patient refuses to take the psychotropic medication that has been prescribed for him, the attending physician shall speak to the patient and attempt to explain: his assessment of the patient's condition; his reasons for prescribing the medication; the benefits and risks of taking the medication; and the advantages and disadvantages of alternative courses of action.
 
 
 98
 If the patient still refuses to take the medication and the physician still believes that medication is a necessary part of the patient's treatment plan:
 
 
 99
 (a) The physician should tell the patient that the matter will be discussed at a meeting of the patient's treatment team;
 
 
 100
 (b) If the patient's clinical condition permits, the physician should invite the patient, to attend the meeting of the treatment team.
 
 
 101
 (c) The physician should suggest that the patient discuss the matter with a person of his own choosing, such as a relative or friend.
 
 
 102
 C. The treatment team shall meet to discuss the physician's recommendation and the patient's response.
 
 
 103
 (1) If the patient is present, the team shall attempt to formulate a treatment plan that is acceptable to the patient and the team. The patient may agree to take medication unconditionally or under certain conditions that are acceptable to the physician.
 
 
 104
 (2) If the patient is not present, the team and the physician shall discuss the physician's recommendation and the patient's response, and shall document their respective conclusions.
 
 
 105
 D. If, after the team meeting, the physician still believes that medication is a necessary part of the patient's treatment plan and the patient still refuses to take the prescribed medication,
 
 Then:
 
 106
 Case 1: Patients Adjudicated Incompetent by a Court
 
 
 107
 (1) If there is a consensus in regard to the necessity of the medication, the physician shall attempt to secure the consent of the patient's guardian.
 
 
 108
 If the patient's guardian, after reasonable notice of the proposed action and a request for consent, refuses or neglects to execute and submit a writing expressing either the grant or denial of consent,
 
 
 109
 Then, The Chief Executive Officer may consent to the administration of medication.
 
 
 110
 (2) If there is disagreement between the team and the physician in regard to medication, then the medical director (or his designee) shall conduct a personal examination of the patient and a review of the record. If the medical director (or his designee) agrees with the physician, the physician shall attempt to secure the consent of the guardian.
 
 
 111
 If the patient's guardian, after reasonable notice of the proposed action and a request for consent, refuses or neglects to execute and submit a writing expressing either the grant or denial of consent,
 
 
 112
 Then, The Chief Executive Officer may consent to the administration of the medication.
 
 
 113
 Case 2: Patients Who Have Not Been Adjudicated Incompetent by a Court
 
 Part I Voluntary Patients
 
 114
 Medication may not be administered to a voluntary patient who refuses to accept it.
 
 Part II Involuntary Patients
 
 115
 The medical director (or his designee) must conduct a personal examination of the patient and a review of the record. If the medical director (or his designee) agrees with the necessity for medication, the medication may be administered as a part of the patient's documented individualized treatment plan.
 
 E. Miscellaneous1. Independent Evaluations
 
 116
 Whenever the medical director (or his designee) is asked to review a medication decision, the medical director shall be authorized to retain an independent psychiatric consultant to evaluate the patient's need for medication. This would be indicated particularly in cases where there is disagreement between the treating physician and the team.
 
 
 117
 If the patient is evaluated by an independent psychiatric consultant invited by the hospital and the consultant recommends a treatment plan that does not include the administration of medication, then the medical director in the report filed in the treatment record, shall address the conclusions and recommendations of the consultant.
 
 2. Review
 
 118
 In addition to the reviews mandated by N.J.S.A. 30:24.2(d)(1), the medical director (or his designee) shall review each week the treatment program of each involuntary patient, who is refusing to accept medication voluntarily, to determine:
 
 
 119
 (a) Whether the patient is still refusing his prescribed medications;
 
 
 120
 (b) Whether medication is still a necessary part of the patient's treatment plan; and
 
 
 121
 (c) Whether the other components of the patient's treatment plan are being implemented.
 
 3. Documentation
 
 122
 Each step of the procedures outlined above shall be documented in the patient's chart.
 
 
 123
 SEITZ, Chief Judge, with whom ALDISERT, Circuit Judge, joins, concurring.
 
 
 124
 I agree with Judge Weis that persons who are involuntarily committed to New Jersey state mental institutions have a qualified constitutional right to refuse antipsychotic medication. As Judge Weis emphasizes, this constitutional right stems from an important liberty interest created by the due process clause of the fourteenth amendment, and not from an interest rooted in state law. I also agree that the district court erred in finding that the administrative procedures adopted by New Jersey subsequent to the filing of the complaint in this action did not facially comport with the requirements of procedural due process. I say this because I believe Judge Weis is correct in holding that the procedures contained in Administrative Bulletin 78-3 are sufficient under the three-factor test of Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Furthermore, I agree that the injunction should be modified rather than vacated because of the finding of the district court that these procedures have not been fully implemented.
 
 
 125
 I write separately because I believe that the least restrictive alternative standard approved by five members of this court is not relevant in deciding the procedural and substantive due process issues presented by this appeal. In deciding whether the procedures contained in Administrative Bulletin 78-3 are sufficient under the Matthews test, I believe it is our duty to determine that the procedures provide reasonable assurances that there will be an opportunity for adequate input by various professionals and the patient before the patient's right to refuse medication can be overridden by the state. The least restrictive alternative standard is irrelevant to a determination of the sufficiency of Administrative Bulletin 78-3 because such a standard does not assist in deciding what procedures are required to protect a patient's right to refuse medication.
 
 
 126
 Furthermore, to the extent that the substantive due process rights of involuntarily committed mental patients are at issue in this case, I believe that the least restrictive alternative standard is an inappropriate standard to govern the conduct of state officials when following the procedures in Administrative Bulletin 78-3. As I noted in my concurring opinion in Romeo v. Youngberg, 644 F.2d 147 (3d Cir. 1980) (in banc), cert. granted, --- U.S. ----, 101 S.Ct. 2313, 68 L.Ed.2d --- (1981), the least restrictive alternative standard is improper for such purposes because "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 178.[1] I would hold that the "substantial departure from accepted professional judgment" standard proposed in my concurring opinion in Romeo governs a patient's constitutional right to refuse antipsychotic medication and the state's ability to override that right.
 
 
 127
 Finally, it is not entirely clear to me how the risk of permanent side effects fits into the constitutional analysis of the other members of the court. I believe that the risk of permanent side effects, although not by itself of independent constitutional significance, is a relevant factor in determining whether an involuntarily committed mental patient has been accorded substantive due process. The risk of permanent side effects would in my view be considered along with other relevant factors in determining whether accepted professional judgment has been exercised.
 
 
 128
 GARTH, Circuit Judge, concurring with whom ALDISERT and JAMES HUNTER, III, Circuit Judges, join:
 
 
 129
 I join Part I (Scope of Review), IIA (State Law Liberty Interest), IIB (Constitutional Liberty Interest), III (Due Process Standard) and IV (Decree) of the majority opinion. I do not join in Part IIC of the majority opinion which deals with "least restrictive (intrusive) treatment."
 
 
 130
 The differences between the majority opinion and this opinion center almost wholly upon two factors which were given constitutional significance by the district court in determining whether a mentally disturbed patient could refuse medication. The majority has now adopted the district court's constitutional standard which includes those two factors "least restrictive treatment" and "risks of side effects."
 
 
 131
 In brief, the district court described a mental patient's right to refuse medication with reference to the following four factors:
 
 
 132
 (1) does the patient constitute a physical threat to other patients and to staff at the institution;
 
 
 133
 (2) does the patient have the capacity to decide on his own particular treatment;
 
 
 134
 (3) do any less restrictive treatments exist; and
 
 
 135
 (4) are there risks of permanent side effects from the proposed treatment.
 
 
 136
 Although I agree that involuntarily committed mental patients have a constitutional right to refuse medication under certain circumstances, and I agree with the majority that New Jersey has established appropriate procedures to protect that right, I do not agree that the existence of "less restrictive" treatments and the risk of side effects must be considered in formulating the constitutional standard. Because of my belief that concepts of least restrictive treatment and risks of side effects have no place in this constitutional analysis, a belief predicated in part on recent Supreme Court developments, I am compelled to dissent from the majority's affirmance of the district court's constitutional holding even though I concur with the majority that however a patient's constitutional rights are measured, New Jersey's regulations[1] are more than adequate to vindicate those rights.
 
 I.
 
 137
 As I have noted above, the district court analyzed the right of a patient to refuse medication with reference to four constitutional factors.
 
 
 138
 The majority apparently agrees with this formulation. However, in affirming the district court's constitutional analysis, the majority emphasizes the district court's third factor (availability of less restrictive treatment) and virtually ignores the district court's fourth factor (risk of side effects). As I have stated, in my opinion, these two factors have no place in a constitutional determination of whether medication may be refused. In order to explain my position which restricts constitutional considerations to (1) the patient's danger to others and to himself, and (2) his mental capacity, a brief review of the relevant legal precepts is in order.
 
 
 139
 In determining the scope of the right to refuse treatment, I begin with an accepted principle of due process: the state may not infringe a liberty interest without demonstrating at least the existence of a rational relationship between the need to intrude on such a protected interest and a legitimate state purpose. The Supreme Court has itself endorsed this principle in the context of involuntary commitment of the mentally ill. The Court has noted that involuntary civil commitment entails "a massive curtailment of liberty," Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), and has held that "(a)t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). Thus to this extent, I agree with the majority that involuntary medication of the mentally ill implicates a liberty interest within the meaning of the due process clause. It is important then, to discern the legitimate state interests underlying civil commitment of the mentally ill, and determine under what circumstances involuntary medication may be said to be rationally related to these legitimate state interests.
 
 
 140
 The state is generally said to have three interests in the involuntary commitment of the mentally ill: prevention of harm to other persons or to property, prevention of harm to the individual who is committed, and treatment or care of an individual in need of it. E. g., Jackson v. Indiana, 406 U.S. 715, 737, 92 S.Ct. 1845, 1857, 32 L.Ed.2d 435 (1972); Donaldson v. O'Connor, 493 F.2d 507, 520 (5th Cir. 1974), vacated and remanded on other grounds, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). These three state interests reflect the exercise of two distinct state powers: the police power to protect the health and safety of the community, and the parens patriae power to act on behalf of an individual who does not have the mental capacity to act in his own best interests.[2] The prevention of harm to other persons or to property, the subject of the first category of state interests listed above, is a legitimate exercise of the police power.[3] Skipping to the third state interest treatment or care of the committed individual is an exercise of the parens patriae power. The second category of state interests, preventing harm to the individual who is committed, draws on elements of both the police and parens patriae powers. Donaldson v. O'Connor, 493 F.2d 507, 520-21 (5th Cir. 1974), vacated and remanded on other grounds, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).
 
 
 141
 While these two state powers the police power and the parens patriae power may provide a basis for the involuntary administration of anti-psychotic drugs to the mentally ill under certain circumstances, as the majority holds and as I agree, they nevertheless do not confer unlimited authority on the state to administer medication against a patient's will. Where the state, in seeking to further its legitimate interests, utilizes, as it does here, means that violate bodily integrity and that constitute a massive imposition on the individual, the courts are charged with limiting the exercise of state authority to only those instances which bear a reasonable relationship to the state purposes to be served.
 
 
 142
 Thus, as I see it, the state under its police power may administer drugs against a patient's will, but only when such an action is necessary to prevent the patient from endangering himself or others. And the state may administer drugs under its parens patriae power, when the best interests of the patient so require, but only when the patient himself does not have the mental capacity to decide on the course of treatment to pursue.[4] Winters v. Miller, 446 F.2d 65, 68-71 (2d Cir.) (until determined to be incompetent, mentally ill individual retains the power to refuse treatment), cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); Lessard v. Schmidt, 349 F.Supp. 1078, 1094 (E.D.Wis.1972) (three judge court) (mentally ill individual should be permitted to make decision on whether to accept hospitalization "unless the state can prove that the person is unable to make a decision about hospitalization because of the nature of his illness"), vacated and remanded on other grounds, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); Developments in the Law Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1212 (1974) (improper to extend parens patriae power to "those who are capable of making their own treatment decisions").[5] Forced administration of drugs outside these contexts cannot be regarded as rationally related to the legitimate state interests underlying civil commitment of the mentally ill, and must be deemed a violation of due process.
 
 
 143
 I recognize that the defendants here argue for a broader authority in the state to compel medication. They refer to the state interest in providing treatment to those in need of it who have been involuntarily committed. They argue, and to this extent I agree with them, that the state has a legitimate interest in treating the sick. If an individual is in need of treatment, as Rennie and the members of his class unquestionably are, the state contends that the compulsory treatment of such a person is rationally related to a legitimate state objective. Thus, under the state's view, the need for treatment alone provides the necessary authority permitting treatment against a patient's will.
 
 
 144
 I have little difficulty in rejecting this position. There can be no dispute that an individual who has not been committed to a mental institution, has a broad due process right not to be medicated against his will. If we were to accept the defendants' view here, this due process protection would largely evaporate, for if the need for treatment alone would provide a warrant for compulsory treatment of a committed person, it would similarly provide a warrant for treating those who have not been committed, but who nonetheless require treatment. Recognizing such authority in the state is plainly inconsistent with the kernel of personal autonomy protected by due process. Thus, it cannot be the mere need for treatment that, without more, empowers the state to provide it in the face of an individual's refusal, but that need must be linked to the state's power to protect the patient or the community from danger, or to the state's power to act on behalf of an individual who does not have the capacity to act in his own behalf. For the purposes of this discussion, the difference between a committed and an uncommitted individual is that the committed individual is more likely to present a danger to himself or society, or to be unable to act in his own best interests.
 
 
 145
 Thus, to summarize my position: the state may administer anti-psychotic medication in the face of a patient's refusal to accept medication only when the state demonstrates either that the medication is necessary to prevent the patient from posing a danger to himself or to others, or that the patient does not have the mental capacity to make a rational decision with respect to medication.[6] Under my analysis, therefore, no other factors qualifying, modifying, or embellishing these two tests are relevant as constitutional measures. Because the district court included two additional considerations which I believe are irrelevant and because the majority opinion affirmed that analysis, I turn next to a consideration of "least restrictive treatment" and the risk of side effects as constitutional measurements of a patient's right to refuse treatment.
 
 II.
 
 146
 The district court held that the patient's right to refuse treatment had to take into account "whether any less restrictive treatments exist," and "the risk of permanent side effects from the proposed treatment." Rennie v. Klein, 462 F.Supp. at 1152. The majority opinion expands upon and qualifies the district court's least restrictive standard, construing it as generally limited to "course of treatment" decisions as distinct from discrete instances of medication. (maj. op. At 859-860) While not excluding emergency conditions, the majority would grant "more discretion" to an attending physician in such situations in choosing the "least restrictive treatment." Id. As I indicate below, neither the formulation now announced by the majority nor the formulation announced by the district court is relevant in a constitutional context.
 
 
 147
 I am satisfied that my analysis to this point compels the conclusion that an involuntarily committed mental patient has a constitutional right to refuse medication, subject only to the two overriding state interests that I have described. I am equally satisfied that I have provided a complete definition of that right, and that there are no further constitutional limitations on the state's power to compel medication beyond those that I have set forth. Thus, it is in this posture that I note my disagreement with the last two factors found in the district court's four-factor analysis and adopted by the majority here.
 
 A.
 
 148
 It must be kept in mind that despite the disclaimer found in the majority opinion, (maj. op. At 859), we are faced with reviewing here day-to-day, even hour-to-hour decisions by hospital staff respecting the administration of medication on a continuing basis. The record developed in the district court demonstrates that the reactions to such treatments are highly individualized and vary markedly from patient to patient. It would not only be impractical for a court to attempt to review these treatment decisions under a "least restrictive alternative" approach, but it seems inevitable that such review would interfere dramatically with the administration of needed medication and essential therapy. Moreover, the imposition of such a standard would, as a practical matter, require each district court judge to exchange his robe for a medical gown.[7] Each judge would of necessity be obliged to assume a supervisory role in the medical discipline, becoming both a super-diagnostician and super-physician for each institutionalized patient. In this very case, for example, the district court was repeatedly called upon to hold hearings and to rule in a medical context on various aspects of Rennie's day to day treatment.
 
 
 149
 In a somewhat analogous context and as the forerunner of a least restrictive doctrine as a constitutional measure these concerns were discussed in our recent en banc decision in Romeo v. Youngberg, 644 F.2d 147 (3d Cir. 1980) cert. granted --- U.S. ----, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981). That case dealt with the constitutional standards applicable to the care of mentally retarded patients in a state institution. Romeo, the patient, sought the right to be free from bodily restraint, a right to personal security and protection from attacks by other inmates, and a right to adequate treatment. However, neither the issues presented in Romeo, nor the claims made by the patient Romeo, nor any aspect of the Romeo record involved the subject with which we are concerned here, i. e., the refusal of an involuntarily committed mentally ill patient to accept anti-psychotic medication. Nor did the Romeo record involve the problems and characteristics of the mentally ill which are critically different from those of the mentally retarded patients.[8]
 
 
 150
 In its discussion, the majority opinion in Romeo, did not hold, as it could not in light of the record on which it was predicated, that "(n)onreversible physical operations" or "the administration of powerful antipsychotic drugs" constitute constitutional violations. Rather it merely stated, that such procedures "may well constitute fundamental liberty violations," and that a "least restrictive analysis," may, therefore, be indicated. The majority opinion, there, explained "(w)here the issue turns on which of two or more major treatment approaches is to be adopted, a 'least intrusive' analysis may well be appropriate."[9] Following this explanation, the majority opinion in Romeo concluded with the following proposed jury instruction which appears in the Romeo Appendix as III.C., supra, p. 173.
 
 
 151
 C. If you find that a selection of a mode of treatment subjected the plaintiff to significant deprivations of liberty, then you must go on and determine whether that decision provided for the least intrusive treatment available under the circumstances. If the defendants considered other alternatives and ascertained that the program adopted was the least intrusive available, then you should find the defendants not liable.
 
 
 152
 Although Romeo, as I have pointed out, cannot govern the least restrictive standard adopted by the majority in this case,[10] I recognize that the majority opinion has drawn heavily on Romeo in order to fashion the contours of Rennie's least restrictive constitutional standard. The majority here, however, contrary to the district court's formulation, which it affirms, rejects the least restrictive concept as it pertains to "individual dosages." Rather the majority maintains that the Constitution requires that any medical treatment program prescribed (as contrasted with the administration of individual dosages of medication that the program calls for) must be the "least restrictive." I cannot agree for at least three reasons.
 
 
 153
 First, because we are bound here by the record in this case. I do not feel free, as apparently the majority does, to hypothesize under what circumstances, and on what differing records, a choice between treatment modes might arise, and once having arisen, might be regarded as sufficient to trigger the formulation of a constitutional standard. That exercise, I suggest, should be deferred until such an issue is properly presented on an appropriate record.
 
 
 154
 Here, on an extensive record which took over thirty days of district court hearings to develop, there is no evidence of a choice between major courses of treatment, nor is there any evidence of any major course of treatment that was considered as an alternative to the psychotropic drug treatment by which Rennie was medicated. Moreover, it not only appears that other modes of treatment were inappropriate, but the district court flatly held that, in the case of an individual such as Rennie, the course of drug treatment which he received was both indicated and required. 462 F.Supp. at 1140.[11]
 
 
 155
 The district court found that Rennie was "acutely psychotic at times," and accepted Dr. Stinett's testimony that Rennie's symptoms warranted both anti-psychotic medication and lithium. The anti-psychotic drug was deemed necessary to curb Rennie's perceived delusions and to control his destructive behavior. 462 F.Supp. at 1140. The court was satisfied that any distinction between schizophrenia and manic depression[12] was academic in this case, as either condition warranted the administration of anti-psychotic medication and lithium, id., and drugs were most useful in diffusing schizophrenic thought patterns during acute psychotic episodes. 476 F.Supp. at 1298. It also found "that the benefits and detrimental side effects of all psychotropic drugs are similar." 462 F.Supp. at 1135. It found "no evidence supporting the superiority of any one of these drugs" over any other. Id. at 1136-37.
 
 
 156
 The district court found further that such "drugs tend to shorten hospital stays and allow patients to function in the community" and referred to testimony "that the failure to treat an acutely psychotic patient with drugs would (constitute) malpractice." Id. at 1137. In this connection it found that "(m)ore studies exist demonstrating the efficacy of the psychotropic drugs in the treatment of schizophrenia than for any other mode of treatment" and that such drugs may be necessary for a patient "to effectively participate and benefit from other types of therapy, including individual or group psychotherapy and occupational therapy." Id. The district court, therefore, found that "psychotropic drugs are widely accepted in present psychiatric practice" and "are the treatment of choice for schizophrenics." Id. These findings are not challenged as clearly erroneous. Krasnov v. Dinan, 465 F.2d 1298 (3d Cir. 1972).
 
 
 157
 Thus, the record and the district court's findings demonstrate beyond question that in this case the only mode of treatment appropriate and considered for Rennie was medication with anti-psychotic drugs. The ensuing discussions in the district court's opinions[13] consequently dealt not with different courses of treatment, but rather with the manner and the extent by which Rennie would be medicated with such drugs. It was in this setting a setting involving individual dosages that the district court formulated its "least restrictive" constitutional analysis an analysis which I reject. While the majority opinion appears to interpret the district court's least restrictive standard in terms of courses of treatment, it nevertheless apparently still adheres to the district court's view that "different drug(s)" or "smaller dosages" or "different therap(ies)" are to be considered in determining the least restrictive standard of professional care. (maj. op. typescript at 20.)[14]
 
 
 158
 However, regardless of how the majority interprets the meaning of its "least restrictive standard" in my opinion, any attempt to construct a "least restrictive" constitutional standard in an area where medical judgment should control is unsound, unworkable and unwarranted. The many subjective determinations that form the matrix of a medical judgment are best left to the members of the medical profession. Such determinations ought not to involve the judiciary in an assessment, even if one can be made, as to whether a particular mode of treatment or a particular discrete treatment, is more or less intrusive than another.
 
 
 159
 Second, the majority has evolved its "least restrictive" treatment standard from cases far removed from the context of treatment involving the mentally ill. In 1960, the Supreme Court decided Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) and introduced the concept of "less drastic means" into our jurisprudential vocabulary. In Shelton, a first amendment case, in explaining why an Arkansas statute was unconstitutional, the court focused on the availability of "less drastic means" in order to attain legitimate governmental objectives. The Arkansas statute required public school teachers to annually list all of their organizational affiliations for the preceding five years. The Supreme Court, while acknowledging that in some respects, the governmental purposes behind Arkansas' requirement might serve legitimate and substantial objectives, nevertheless held that such purposes cannot be pursued by means that stifle "fundamental personal liberties when the end can be more narrowly achieved." Id. at 488, 81 S.Ct. at 252. The court, in striking down the statute, therefore required as common sense would dictate, that "the breadth of (a) legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose". Id. As Chief Judge Seitz observed:
 
 
 160
 Since its first exposition of the less drastic means doctrine, the Supreme Court has been rather cautious in using the doctrine because some less drastic alternative almost always exists. If used without caution, the doctrine could invalidate almost any state action. See generally Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89, 99 S.Ct. 983, 992-93, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring); Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464, 472 (1969).
 
 
 161
 Romeo v. Youngberg, supra, at 180 (Seitz, C. J., concurring)
 
 
 162
 Moreover, the cases giving rise to the least restrictive doctrine, some of which are relied upon by the majority in extending this doctrine to Rennie, involve only a single legislative enactment or a discrete state action as contrasted with the continuing judicial supervision required in a context such as the present one. See, e. g., Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 185, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979) (statute prescribing number of signatures required for listing on electoral ballot); Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977) (statute regulating labeling of apples shipped into state); Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (administrative order regulating shipment of cantaloupes out of state); Aptheker v. Secretary of State, 378 U.S. 500, 508, 84 S.Ct. 1659, 1664, 12 L.Ed.2d 992 (1964) (statute prohibiting issuance of passports to members of Communist organizations); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (statute requiring teachers to disclose organizations to which they belong or which they support); Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951) (ordinance requiring pasteurization of milk at approved plants within five miles of center of city).
 
 
 163
 Application of the least restrictive principle in those cases did not require continuing judicial scrutiny, nor did it require judicial intrusion and a continuing judicial presence in another professional discipline. All are inevitable in the present context. I therefore do not believe that the constitutional right to refuse treatment which both the majority and I recognize, albeit on different bases, can either be enlarged or diminished in scope depending upon the course of treatment adopted or the frequency of administration, dosage, or kind of medication prescribed.
 
 
 164
 Third, the continued vitality of Romeo's "least intrusive choice of treatment" standard is questionable in any event.[15] Halderman v. Pennhurst, 612 F.2d 84 (3d Cir. 1979) (en banc ) rev'd and remanded, --- U.S. ----, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), which addressed only the rights of the mentally retarded, and not the rights of the mentally diseased, as we do here, held in a statutory, and not a constitutional, context that the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 et seq., required habilitation of the mentally retarded in the least restrictive environment.
 
 
 165
 Our decision in Halderman was reversed by the Supreme Court shortly before Rennie was argued. Justice Rehnquist, writing for the Supreme Court, analyzed the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 et seq., and indicated that in his view it was questionable whether the least restrictive concept was appropriate in that setting. Pennhurst State School and Hospital v. Halderman, --- U.S. ----, ---- n. 12, 101 S.Ct. 1531, 1539 n. 12, 67 L.Ed.2d 694 (1981).
 
 
 166
 Shortly thereafter the Supreme Court granted certiorari to the First Circuit to consider that Circuit's analogue to Rennie, Rogers v. Okin, 634 F.2d 650 (1st Cir. 1980) cert. granted, --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981). Rogers also refers to the least restrictive standard and the Supreme Court then granted certiorari to consider Romeo v. Youngberg, supra, itself, the very case which gives rise to the least restrictive standard adopted by the majority here. Logic would indicate that the likelihood of the survival of "least restrictive" as a constitutional standard is slight indeed. Thus, it seems wrong for the majority, in the face of these case developments, to factor into an otherwise appropriate constitutional standard, a doctrine which is already inappropriate and suspect in this area and which has been torn out of its original first amendment context.
 
 
 167
 In my opinion, therefore, whatever vitality a "least restrictive alternative" doctrine may have in other contexts, and we address none such other here, there is no place for such a doctrine in a constitutional analysis of a patient's right to refuse medication under these circumstances.[16]B.
 
 
 168
 I also differ with the district court in its inclusion of the fourth factor, "the risk of permanent side effects from the proposed treatment," as a consideration in defining the circumstances under which the state may compel treatment. As I noted earlier the majority opinion does not even address this factor. I believe that the district court's analysis which has apparently been affirmed by the majority opinion but without discussion, confuses the contexts in which consideration of this factor is appropriate.
 
 
 169
 The majority opinion properly discussed the risk of side effects in determining the existence of a patient's liberty interest in refusing treatment. See maj. op. At 855-856. But a holding that the risk of side effects plays a role in determining whether a liberty interest is implicated does not go the whole way. It does not answer still another critical question: under what circumstances may treatment be refused by the patient or, conversely, compelled by the state? I have answered that question by stating that in my opinion the state may compel medication when it demonstrates either that the patient poses a danger to himself or to others, or that the patient does not have the mental capacity to rationally refuse treatment.
 
 
 170
 The district court, however, rather than employ its fourth factor solely in the determination of the existence of a liberty interest, would balance the risk of permanent side effects against the danger that the patient presented to himself or others, and against the patient's incapacity to rationally determine his course of treatment. Such an analysis would allow the patient to refuse medication entailing a risk of side effects even when the patient posed a risk of harm to himself or to others.
 
 
 171
 Just as I reject the district court's balancing formula and the majority opinion's adherence to a least restrictive standard, so too it seems plain to me that the state's power to administer medication posing a risk of serious permanent side effects is indeed limited, but not by the patient's right to refuse treatment. It is, rather, limited by the standard of care with which the state is charged. The state, under my analysis, has power to treat a person against his will once it demonstrates that the treatment compelled is essential for the safety of the individual or the community. Alternatively, the state has power to compel medication when it appears that the patient does not have the capacity to decide for himself on the appropriate course of treatment. Once the state has satisfactorily demonstrated that it may compel treatment, it may treat that person even if the only medication or treatment available poses a risk of permanent side effects. How much risk the state may impose on an involuntary patient must be determined with reference to the applicable standard of care. The state cannot provide medical treatment that entails an unacceptably high risk of serious side effects in light of the patient benefits to be gained and the disorders to be remedied. Such a course of treatment would constitute medical malpractice. Even more so, the state cannot compel treatment where its conduct would transgress the more stringent standard (for a plaintiff to meet) by which constitutional torts are measured.[17] Thus, I recognize that the risk of permanent side effects limits state authority to administer medication. But these risks do not independently strengthen the patient's due process right to refuse medication, and do not independently figure in the calculus of when the state may compel medication over a patient's refusal. It is this distinction that is critical for the purposes considered here, and in failing to recognize this distinction, I would hold the district court's analysis and consequently the majority opinion's affirmance of that analysis to be flawed.
 
 III.
 
 172
 I conclude, then, that the protection of liberty embodied in the due process clause of the Fourteenth Amendment includes a right to refuse administration of anti-psychotic drugs. The state may compel such medication in the face of a patient's refusal to accept it only by demonstrating either that the medication is necessary to prevent a danger to the patient or to others in the community, or that the patient does not have the mental capacity to determine for himself his course of treatment. Because the majority opinion has added to this constitutional measurement inappropriate and irrelevant considerations of "least restrictive treatment" and risks of side effects, neither of which I regard as constitutional imperatives, I respectfully disagree.
 
 
 173
 To the extent, however, that the majority opinion holds that New Jersey's procedures protect the liberty interest of involuntarily committed mentally ill patients to refuse medication, I join the majority and thus concur in that holding. I do so because in considering an appeal from the entry of a preliminary injunction, our scope of review is limited to "determining whether there has been an abuse of discretion, an error of law or a clear mistake in the consideration of the proof." Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir. 1975) (emphasis supplied). It is obvious to me from the discussion of Administrative Bulletin 78-3 in the majority opinion, that the district court's injunction must be vacated on the ground that the district court erred as a matter of law in concluding that the procedures established by New Jersey did not satisfy the requirements of due process.
 
 GIBBONS, Circuit Judge, dissenting:
 
 174
 I join in Part II of the opinion of the court which sets forth the legal standards applicable by virtue of the fourteenth amendment to the involuntary imposition of medical treatments by persons acting under color of state law. I dissent, however, from the judgment of the court insofar as it modifies the preliminary injunction which was entered in the trial court, because the findings supporting that injunction were not clearly erroneous and the scope of pendente lite relief which was ordered was well within the range of permissible district court discretion. Part III of the opinion of the court does not satisfactorily explain why, in reviewing that preliminary injunction, we are free in this case to disregard those findings or to substitute our discretion for that of the trial judge.
 
 
 175
 The majority opinion concludes that Administrative Bulletin 78-3 sets forth procedures which, if followed, satisfy fourteenth amendment due process standards for the protection of the liberty interest it recognizes. In the abstract that may be so. The district court was not, however, dealing with abstractions. It was presented with a record of ongoing substantive violations of that liberty interest by those state officials having custody of the unfortunate class members whom Rennie represents. The record also shows that Bulletin 78-3 was adopted only after this lawsuit was commenced.
 
 
 176
 This represented the Division's first formal attempt to deal with the problem of patients who refuse medication, and was in response to the issues raised in this litigation.
 
 
 177
 Rennie v. Klein, 476 F.Supp. 1294, 1303 (D.N.J.1979). It is a fair inference that the Bulletin is nothing more than a response to the stimulus of a threatened court order. The implementation of the Bulletin was hardly enthusiastic. Although after March, 1979 the central office of the Division of Mental Health was supposed to review the case of any patient compelled to take medication, a representative of the office could confirm only two such reviews having taken place by late summer of that year, although 40 to 50 patients a month were recorded as refusing drugs at Marlboro Hospital alone. The witness added that a Dr. Rotov:
 
 
 178
 might have reviewed "several" other cases (besides Rennie's), and examined some patients personally.... The Court finds that this level of review is hardly a regular procedure, and is not quickly or reliably available to patients.
 
 
 179
 476 F.Supp. at 1303. The court found, moreover, that the Bulletin was not rapidly implemented at the various hospitals. It was ignored in two hospitals for nine months, and was not even called to the attention of the medical director of Marlboro Hospital for eight months. 476 F.Supp. at 1303. Given the evident lack of enthusiasm in the Division of Mental Health for addressing the problem in the first place, and for implementing the Bulletin after it was devised as a response to the lawsuit, the court's skepticism about relying on it as a substitute for an injunction is understandable.
 
 
 180
 I find it unnecessary to determine whether the Bulletin sets forth the process that is due. The opinion of the court does not refute plaintiff's evidence establishing that defendants have largely failed to comply with the procedures which it specifies. My principal disagreement with the majority is over the implicit suggestion that those procedures, though not implemented, nonetheless limit the remedial authority of the court to cure a substantive violation, because in the abstract or on their face they satisfy the minimum requirements of due process. The Bulletin cannot limit the scope of pendente lite injunctive relief. It must be recalled that the trial court has not yet acted finally. It concluded, however, based upon its evaluation of all the evidence and the testimony, that plaintiff class members were suffering irreparable harm and that, at least until it received further information, more protection against forced medication was, in the New Jersey institutional climate, required. To support that conclusion the court made detailed findings in light of which the preliminary injunctive relief it ordered was demonstrably not an abuse of discretion. Oburn v. Shapp, 521 F.2d 142 (3d Cir. 1975); see also Doran v. Salem Inn, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1976).
 
 
 181
 For example, the court found significantly, that refusals had been underreported since the Bulletin's adoption:
 
 
 182
 A major problem in implementation of Bulletin 78-3 is identifying those patients who refuse drugs. At Marlboro Hospital about 40 to 50 patients a month have been recorded as refusing. Tr. XXIX, 80, 87-88; Ex. D-34, pp. 45-48. Trenton Hospital has reported about 15 to 40 a month. Ex. D-38, pp. 46-49. Ancora Hospital has invoked the Bulletin for only Mr. Rennie and the 23 year old woman discussed above. No other patient has been reported to have refused since the beginning of the year. Ex. P-33, p. 77; Ex. D-35, pp. 24-26. Greystone has only reported three patients refusing since the beginning of the year, Ex. P-33, pp. 80-81; Ex. P-47, pp. 29-31, and the Gardner Geriatric Center has only acknowledged one refusal. Ex. D-47, pp. 26-28; Ex. J-6, p. 24.
 
 
 183
 The record also reflects the fact that in a ward of 70 patients at Boston State Hospital, which has been prohibited from forcing medication by federal court order, 10 to 12 patients refuse medication at any one time. Tr. XXVII, 35-36. A psychiatrist with experience at state hospitals in New York testified that five percent of patients refuse medication at a given time. Tr. XXVIII, 12.
 
 
 184
 The patient populations at Trenton, Marlboro and Boston State are similar to those at Greystone and Ancora. The court attributes the discrepancy in statistics to a substantial failure by staff at the latter hospitals to report refusals. Also, certain hospitals overuse the exception in the Bulletin for emergency situations. Tr. XXX, 17.
 
 
 185
 476 F.Supp. at 1303-04. The court's factual findings that staff members have failed to report refusals and have abused the "emergency" exception in the Bulletin are not clearly erroneous. The court also found that many patients are too intimidated to refuse medication and thereby trigger the review procedures in the Bulletin:
 
 
 186
 Even if all hospitals accurately reported the number of overt refusals by patients, many patients are too intimidated to attempt to refuse medication and would still be ignored. Certainly there has been extensive use of forced injections in the hospitals when both voluntary and involuntary patients refused to take medication orally. Tr. XVIII, 71, 75, 88, 115; Tr. XX, 8-20; Tr. XXII, 18-20, 104; Tr. XXIII, 74-76; Tr. XXIX, 112-19; Tr. XXXI, 95-107; Tr. XXXII, 65; Ex. P-28, p. 11; Ex. P-35, p. 6; Ex. P-60; Ex. P-61; Ex. P-65; Ex. P-75. The Marlboro medical director candidly admitted that drugs are still systematically forced on patients. Tr. XXIX, 137. Often forced injections are doses of long-acting prolixin which not only has a much longer effect than other psychotropics but usually has more immediate adverse side effects. Tr. XXII, 104; Tr. XXXI, 108; Ex. D-23, 70-71; Zander, Prolixin Decanoate: A Review of the Research, in 2 Mental Disability L.Rep. 37-39 (1977). Therefore it would be quite rational for patients to conclude that resistance to drugs would result in their receiving a more unpleasant medication.
 
 
 187
 476 F.Supp. at 1304. This finding of intimidation is not clearly erroneous. Intimidation, if it exists, makes the Bulletin meaningless since it only applies to refusals of medication. The court also found that although a review is initiated only after a refusal to accept medication, there is little evidence that the hospitals have taken affirmative steps to inform patients of their right to refuse. 476 F.Supp. at 1304. Thus the court found that a combination of underreporting, intimidation, and induced ignorance seriously undermined confidence that the review procedures of the Bulletin would ever become readily available to members of the plaintiff class.
 
 
 188
 For those instances in which refusals of medication actually occur, the court's findings cast doubt upon the effectiveness in actual operation of the Bulletin's procedures:
 
 
 189
 Much of the evidence concerning use of Bulletin 78-3 focused on review by the medical director of refusals by involuntary patients. Few of the recorded refusals even reach that level, partly as a result of legitimate and desirable agreement by patients with their doctors or treatment team to take some medication, and partly the result of wrongful coercion of patients. The Marlboro medical director overruled three of the ten cases which reached his desk since adoption of the Bulletin. Tr. XXIX, 21-22; Ex. D-34, pp. 45-47. The Ancora medical director upheld the treating physician in the two cases referred to him. Tr. XXXIII, 71; Ex. D-35, pp. 24-26. The same statistic applies to Greystone. Tr. XXXI, 14; Ex. P-47, pp. 29-31. At Trenton, the medical director rescinded half of the six forced medication orders she reviewed. Ex. D-38, pp. 46-49. There is no evidence of any decision reaching the medical director at Gardner. Ex. D-36, pp. 45-47.
 
 
 190
 The court does not find these statistics themselves indicative of the capability or independence of the medical directors. But these officials can be faulted for their failure to insure that the Bulletin is fully implemented, that patients' refusals are acknowledged and counted, and that force and threat of force or punishment is not used to administer medication.
 
 
 191
 The medical directors asserted in their testimony that they indeed can exercise independent and conscientious reviews. Tr. XXIX, 21-22; Tr. XXXI, 13; Tr. XXXIII, 40. But some of the individual cases described above rebut those assertions. The Greystone medical director even delegated his responsibility to every staff psychiatrist under a clause in the Bulletin which allows another doctor to act for the medical director when he is away; however, this interpretation was later overruled by Dr. Rotov. Tr. XXXI, 48-49. The Ancora medical director testified that, in his opinion, an emergency justifying forced medication could last over 30 days. Ex. P-29, p. 31. In fact, the medical directors have not even acknowledged a constitutional right to refuse treatment or followed the court's guidelines on the law in deciding refusal cases. Tr. XXIX, 21; Tr. XXXIII, 40.
 
 
 192
 The medical directors' actions demonstrate a lack of independence and objectivity when reviewing the actions of their staffs. The court believes this stems largely from their responsibilities; they must have the support of their personnel, whose jobs are made easier when patients are subdued by medication. Unfortunately the rights and health of patients are sometimes ignored.
 
 
 193
 476 F.Supp. at 1305 (emphasis supplied). These findings, not clearly erroneous, certainly support the court's conclusion that something more than reliance on the Bulletin was appropriate.
 
 
 194
 The majority disregards these findings and substitutes its own intuitive judgment that the Bulletin will "if carefully followed, pose only a minor risk of erroneous deprivation." P. 861. It bears repeating, however, that a pattern of patient abuse, mistaken diagnoses, and inadequate record-keeping has been documented. The medical directors have denied the very existence of an underlying right to refuse treatment and the appellants still contest its existence on appeal. Whatever may be said about the contours of procedural due process in the abstract, concretely the court had the obligation to attempt to fashion a temporary injunction which would be effective in bringing the pattern of substantive violations to an end. Plainly it cannot be considered an abuse of discretion for the court to have concluded that a more independent review was required than that proposed as a litigation response by the reluctant defendants. Nor did the court misconstrue Supreme Court precedents or apply erroneous legal standards.[1] With respect to the need for greater independence, the court found:
 
 
 195
 Certain testimony concerned plaintiffs' request for independent review by some type of hearing board or examiner of decisions to forcibly medicate. The court accepts the opinions of those experts who indicated that someone outside the hospital structure would provide a fairer, more accurate review of patients' refusal rights. Tr. XVII, 85; Tr. XXIV, 108-11; Tr. XXVI, 58; Tr. XXXII, 160-63.
 
 
 196
 The court also believes that if an independent check on forced medication is established, doctors would learn the legal limits of involuntary medication and the number of attempts to force psychotropics would eventually decrease. This would also mean that the number of cases reaching an independent decision-maker would eventually drop to a relatively small number of disputes. The court cannot specifically gauge the cost of an independent review system, but it rejects the $3 million per year figure provided by defendants, Tr. XXX, 42-46, as based on overestimates of the number of reviews and the number of hours required for each hearing.
 
 
 197
 More sensitivity on the part of treating physicians would also engender better patient-doctor relations. Less use of psychotropics and more attention to patient's feelings about their treatment would likely improve patient-staff relations and foster patients' individual dignity. Tr. XXIX, 19, 78-79, 89-90. While the authority granted an outside review officer will initially cause resentment among many doctors and staff members of the hospital, Tr. XXVII, 49; Tr. XXXIII, 43, the court believes that a carefully structured review system would eventually be accepted by most personnel as review under the Bulletin has been accepted. Tr. XXIX, 19; Tr. XXXI, 18; Ex. P-29, p. 47.
 
 
 198
 476 F.Supp. at 1306. These findings, which involve credibility determinations, are not clearly erroneous. They suggest the need to take steps to educate the reluctant defendant doctors in becoming sensitive to patients' constitutional rights, the existence of which, even today, they deny.
 
 
 199
 Moreover the court in the quoted findings rejects the defendants' overblown estimates of cost of the independent review system it ordered. The majority, while not expressly reversing this credibility judgment, notes its acute awareness of finite state resources (P. 863). However, aside from the exaggerated estimate which the trial court refused to accept, there is no record evidence from which it can be concluded that the system which the trial court ordered will involve any net cost. There is abundant evidence of excessive reliance upon psychotropic drugs. No evidence was presented as to the cost of those drugs, but it is quite possible that the effect of enforcing patients' rights in this area would be to reduce the hospital's overall medication budget.[2] The majority's discussion of finite state resources is rank speculation.
 
 
 200
 Even less defensible is the majority's decision to vacate that part of the preliminary injunction which directs the defendants to submit to the court monthly reports describing in reasonable detail their implementation of the Administrative Bulletin and the court's order pending entry of a final order. 476 F.Supp. at 1315. This elementary precaution, designed to enlighten the court as to the appropriate contours of final injunctive relief, has been vacated without discussion, despite the fact that the district court retains jurisdiction to consider at a later date the need for measures to enforce compliance with the procedures contained in Bulletin 78-3. Respectfully, I ask my colleagues how that provision can, under any definition of the term, be deemed to be an abuse of discretion. Certainly the judge is entitled to know whether the steps which have been taken as a result of the lawsuit have actually been effective in bringing to an end the pattern of violations of constitutional rights which, he found, were committed by health professionals. Judge Brotman was hardly donning a white coat, as the majority opinion suggests, when insisting that information essential for the formation of an informed judgment at final hearing be preserved and brought to his attention.
 
 
 201
 Part III of the majority opinion contains at least three fundamental errors. First, it disregards the trial court's factual findings. Second, it departs from the appropriate standard of review of district court discretion with respect to pendente lite relief. Third, it confuses the standard for injunctive relief from an established pattern of illegal conduct with the distinct question of what, in the abstract and absent such an established pattern, would be an appropriate procedural rule for safeguarding a substantive right. The last error is the most egregious. The case before us is not one in which the defendants admit the existence of the substantive right and plaintiffs direct their challenge solely to the sufficiency of the state procedures on their face. Rather the record demonstrates that in practice these procedures have failed to protect plaintiffs' substantive liberty interest, thus entitling them to the protection of the court's broad remedial powers. We are dealing then with more than a dispute over what minimum procedural due process the fourteenth amendment requires for the protection of an acknowledged right. Cf. Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Clearly a court, faced with defendants who dispute the very existence of the constitutional right at stake, may supplement such minimum safeguards if, within its sound discretion, it concludes that this is necessary to the fashioning of effective pendente lite relief. See, e. g., Todaro v. Ward, 565 F.2d 48, 52-53 (2d Cir. 1977); Morris v. Travisono, 509 F.2d 1358 (1st Cir. 1975); cf. 28 U.S.C. § 1651. The emotional negative response which our recognition of basic human rights for the involuntarily committed evokes in some quarters should not lead the majority of the court to announce an opinion which in this and other contexts will have unfortunately inhibiting consequences upon the ability of trial judges to fashion effective injunctive relief.
 
 
 202
 Thus I dissent from Part III of the opinion of the court and from the judgment. I would affirm the district court order in all respects.
 
 
 
 *
 Chief Judge Seitz, and Judges Aldisert, Adams, Gibbons, Hunter, Garth, Higginbotham, and Sloviter join in sections II(A) (State Law liberty interest), and II(B) (Constitutional liberty interest), of the majority opinion. Chief Judge Seitz, and Judges Aldisert, Adams, Hunter, Garth, Higginbotham, and Sloviter also join in sections I (Scope of Review), III (Due Process standard), and IV (Decree). Judges Adams, Gibbons, Higginbotham, and Sloviter join in section II(C) (Least intrusive means)
 
 
 [1]
 The complaint alleged violations of four rights: 1) to refuse treatment in non-emergency situations; 2) to receive treatment; 3) of access to counsel; and 4) to be free from physical abuse while in custody
 
 
 [2]
 Administrative Bulletin 78-3, issued by the Division of Mental Health and Hospitals of the New Jersey Department of Human Services, details substantive and procedural standards for the administration of psychotropic medication to voluntary and involuntary patients at state hospitals
 The Bulletin is reported in full as an appendix to the district court's first opinion. See 462 F.Supp. at 1148-51.
 The term 'psychotropic' medication refers generally to drugs used in treating psychiatric problems. One subclass of the psychotropics are the "antipsychotic" drugs, which are primarily used to treat thought disorders. Only the antipsychotics are the subject of our opinion here. Another subclass of the psychotropics are drugs such as lithium and antidepressants, which are primarily used to treat mood disorders. The latter medications, which were discussed briefly by the district court, are not considered here. See 462 F.Supp. at 1136-37; Rogers v. Okin, 634 F.2d 650, 653 n.1 (1st Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981).
 
 
 [3]
 The court denied Rennie's request for an injunction on his own behalf after the parties reached an agreement to use a different drug. Later, after Rennie's condition worsened, the court agreed that antipsychotic drugs should be administered. See 462 F.Supp. at 1152-53
 
 
 [4]
 As originally certified, the second and third subclasses included minors as well as adults. The district court later placed voluntary and involuntary patients under the age of eighteen into separate subclasses and denied a preliminary injunction as to them because the plaintiffs "had not provided adequate proof concerning the treatment of minors and the role of parents and guardians in determining minor patients' right to refuse." 476 F.Supp. at 1298 n.2
 
 
 [5]
 A petition for certiorari for review of the order of the district court before judgment in this court was filed under U.S.Sup.Ct. Rule 18, 28 U.S.C. It was denied by the Supreme Court. 49 U.S.L.W. 3911 (No. 80-6660)
 
 
 [6]
 The district court refers throughout its opinion to a privacy interest as the basis of the right to refuse treatment, rather than a liberty interest. We believe that nothing of significance turns on this choice of characterizations, but feel that a right to refuse treatment is better viewed as derived from constitutionally protected liberty. We shall refer, then, to a liberty interest throughout this opinion
 
 
 [7]
 There may be a lurking equal protection issue as well. If there is a constitutional right to be free from overly intrusive medication, and prima facie, involuntarily confined patients are as competent as voluntarily admitted persons, there would seem to be some question about excluding the former from the benefits of the statute. The parties have not addressed the issue, and in view of our disposition, we need not either
 
 
 [8]
 The risk of serious side effects stemming from the administration of antipsychotic drugs is a critical factor in our determination that a liberty interest is infringed by forced medication. Although there is spirited debate in the psychiatric community over the extent and severity of serious side effects, we accept the district court's findings that such injuries occur often enough to be of deep concern. See, e. g., Plotkin, Limiting the Therapeutic Orgy: Mental Patient's Right to Refuse Treatment, 72 Nw.U.L.Rev. 461, 474-78 (1978); Rhoden, The Right to Refuse Psychotropic Drugs, 15 Harv.C.R.-C.L.L.Rev. 363, 375-82 (1980)
 
 
 [9]
 The district court also noted that recent research suggests that there may be a link between psychotropic drugs and suicidal depression. 462 F.Supp. at 1138. For a discussion of the possible emotional and social side effects of psychotropics, see Brooks, The Constitutional Right to Refuse Antipsychotic Medications, 8 Bull.Am.Acad.Psychiat. & L. 179 (1981); Comment, Madness and Medicine: The Forcible Administration of Psychotropic Drugs, 1980 Wis.L.Rev. 487, 530-39
 
 
 [10]
 Although Ingraham v. Wright, 430 U.S. at 669 n.37, 97 S.Ct. at 1411 n.37, did not foreclose the possibility that the eighth amendment may be applicable to punishments not labeled "criminal" and mentioned mental institutions. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct.1861, 60 L.Ed.2d 447 (1979), appears to have resolved the doubt. Wolfish determined that the eighth amendment is an inappropriate basis for analysis of conditions in which pretrial detainees must be confined since no adjudication of guilt has been made in their case. Id. at 535, 99 S.Ct. at 1872
 
 
 [11]
 The issue of a "right to treatment" is not presented in this case and we do not address it here. See Pennhurst State School and Hospital v. Halderman, --- U.S. ----, ---- n.12, 101 S.Ct. 1531, 1539 n.12, 67 L.Ed.2d 694 (1981)
 
 
 [12]
 In this opinion we address only the rights of persons involuntarily committed to state institutions where no adjudication of incompetency has been made. N.J.Stat.Ann. § 30:4-24.2(c) (West 1981), provides in part that "(n)o patient may be presumed to be incompetent because he has been examined or treated for mental illness, regardless of whether such evaluation or treatment was voluntarily or involuntarily received."
 In this respect, New Jersey's statute is like many other jurisdictions'. It is simply not true that all persons involuntarily committed are always incapable of making a rational decision on treatment. For example, in this case, the district court indicated that Rennie is sometimes capable of making such a decision, but that his capacity fluctuates. See 462 F.Supp. at 1141. Psychiatric literature indicates that many forms of mental illness have a highly specific impact on the victims, leaving decision-making capacity and reasoning ability largely unimpaired. See Developments in the Law Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1214-15 (1974).
 
 
 [13]
 The Court of Appeals for the First Circuit has adopted a similar approach. In Rogers v. Okin, 634 F.2d 650 (1st Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981), the court held that before antipsychotic drugs may be administered, "reasonable alternatives ... must be ruled out.... Indeed, it may be possible that in most situations less restrictive means will be available." Id. at 656
 Congress follows the same path. Section 9501 of the Mental Health Systems Act, 42 U.S.C.A. §§ 9401-9503 (Supp.1981), provides in part: "It is the sense of the Congress that each State should review and revise, if necessary, its laws," taking into account that a patient should be accorded "(1)(A) (t)he right to appropriate treatment and related services in a setting and under conditions that ... (i) are the most supportive of such person's personal liberty; and (ii) restrict such liberty only to the extent necessary consistent with such person's treatment needs, applicable requirements of law, and applicable judicial orders."
 The report of the Senate Committee on Labor and Human Resources, in commenting on the Act, quotes approvingly from the President's Commission on Mental Health: "The criterion 'least restrictive setting' refers to the objective of maintaining the greatest degrees of freedom, self-determination, autonomy, dignity, and integrity of body, mind, and spirit for the individual while he or she participates in treatment or receives services." S.Rep.No. 712, 96th Cong., 2nd Sess. 77, reprinted in (1980) U.S.Code Cong. & Ad.News 3372, 3444.
 
 
 [14]
 See Hoffman & Foust, Least Restrictive Treatment of the Mentally Ill: A Doctrine in Search of Its Senses, 14 San Diego L.Rev. 1100, 1113-15 (1977)
 
 
 [15]
 This same point is made in the Senate Committee Report on the Mental Health Systems Act, supra note 12. In discussing section 501(1)(D) of the Act, (codified at 42 U.S.C.A. § 9501 (Supp.1981)), which requires a patient's written consent to a "mode or course of treatment," the Committee wrote that it "intend(ed) to require written patient consent only to the type, manner, and pattern of treatment. It is not intended that a separate, written consent form be required for each pill, shot or treatment administered pursuant to the agreed-upon plan." S.Rep.No. 712, 96th Cong., 2d Sess. 81, reprinted in (1980) U.S.Code Cong. & Ad.News 3372, 3449. See also, Brooks, supra note 8
 
 
 [16]
 The due process analysis is compatible with the least intrusive means approach as well as that utilized in the concurring opinions
 
 
 [17]
 This appeal has required us to review only the constitutional adequacy of New Jersey's regulations. However, on October 10, 1980, Congress passed a Mental Health Systems Act, 42 U.S.C. §§ 9401-9503, which includes § 9501, a "Bill of Rights" for mental health patients. A comparison of § 9501 with New Jersey's Administrative Bulletin 78-3 reveals that New Jersey has indeed anticipated and accommodated virtually all of the concerns expressed in the Mental Health Systems Act with the exception of the requirement for written patient consent
 We do not address any provisions of that act in this opinion, because it was not before the district court and has neither been briefed nor argued by the parties. Our decision to forgo discussion of the act will not prejudice the parties, not only because Bulletin 78-3 is consistent and compatible with the statute, but also because our holding does no more than modify the district court's preliminary injunction. As we have noted earlier, the district court retains jurisdiction and may in its discretion consider the Mental Health Systems Act as relevant to the remaining proceedings.
 The modified decree which we order today includes no provisions requiring written consent forms before medication of either voluntary or involuntary patients. There is some indication in the record that the state may wish to institute such a procedure and we do not foreclose the possibility of such a requirement after further proceedings in the district court. Of course, the modified decree is not intended in any way to prevent the defendants, at their option, from implementing more expansive procedures to protect the patients' interests.
 
 
 [1]
 Although Romeo dealt with the constitutional rights of the institutionalized mentally retarded, I believe that the analysis in my concurrence rejecting the least restrictive alternative standard also applies to the constitutional rights of the institutionalized mentally ill
 
 
 [1]
 New Jersey Division of Mental Health and Hospitals Administrative Bulletin 78-3 appears as the Appendix to the district court's opinion in Rennie v. Klein, 462 F.Supp. 1131 (D.N.J.1978) at 1148-1151
 
 
 [2]
 See Romeo v. Youngberg, 644 F.2d 147 (3d Cir. 1980) (en banc) cert. granted, --- U.S. ----, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981)
 
 
 [3]
 "When civil commitment is used to vindicate a societal interest rather than to further the interest of the mentally ill individual, it constitutes an exercise of the police power." Developments in the Law Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1222 (1974)
 
 
 [4]
 As the majority points out, At 859, note 12, it cannot be assumed that an individual does not have the capacity to make a rational decision on a course of treatment simply because he has been involuntarily committed to a state mental institution
 One commentator writes:
 If every mental illness automatically rendered the affected individual incapable of rational decisionmaking regarding the advisability of hospitalization, there would be no due process objection to parens patriae commitments based solely on the presence of mental illness. However, psychiatric literature indicates that many forms of mental illness have a highly specific impact on their victims, leaving decisionmaking capacity and reasoning ability otherwise largely unimpaired. Moreover, in numerous areas of the law, lack of capacity to undertake the relevant function rather than the mere presence of a mental illness is required to justify an exercise of the parens patriae power.
 Developments in the Law Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1214-15 (1974) (footnotes omitted).
 
 
 [5]
 The limitation on parens patriae commitments suggested by Lessard and Winters appears to be required by the due process clause. Since the state interest in acting as parens patriae is premised on the need for the state to act to protect the well-being of its citizens when they cannot care for themselves, the imposition of involuntary commitment would seem necessary to vindicate that interest only when an individual is incapable of making his own evaluation of his need for psychiatric treatment. By contrast, compulsory hospitalization of persons with the mental capacity to determine the desirability of obtaining care in accordance with their personal values would
 interfere with individual autonomy and physical liberty without any assurance that the state, as a substitute decisionmaker, would better ascertain the best interest of the individual.
 Developments in the Law Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1213-14 (1974) (footnotes omitted).
 
 
 [6]
 Other than in the respect that Massachusetts legislative enactments differ from those of New Jersey, I do not read the recent First Circuit Court of Appeals opinion in Rogers v. Okin, 634 F.2d 650, (1st Cir. 1980) cert. granted, --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981), as varying in any substantial or material manner from my analysis here. Nor do I read the Rogers discussion of a least restrictive standard as a constitutional imperative. Rather, that discussion, in the context in which it appears, seems to me in its nature to be more akin to the non-constitutional administrative provisions which appear in New Jersey Administrative Bulletin 78-3
 
 
 [7]
 Even the majority opinion recognizes that the participants in the procedure adopted by New Jersey to vindicate the patient's due process rights must be "mental health professionals rather than judges who have doffed their black robes and donned white coats." (maj. op. typescript at 27)
 
 
 [8]
 Romeo v. Youngberg, supra, at p. 154 n.1. Cf. Kremens v. Bartley, 431 U.S. 119, 135-36, 97 S.Ct. 1709, 1718, 52 L.Ed.2d 184 (1977)
 
 
 [9]
 Id. at 166
 
 
 [10]
 The Romeo discussion, as it pertains to anti-psychotic drugs and surgery has been characterized as "bald dictum." Id. at 186 (Garth, J., concurring)
 Chief Judge Seitz, in his concurring opinion in Romeo stated:
 I also emphasize that, as the majority appears to concede, this appeal does not present claims involving nonreversible surgery or the administration of antipsychotic drugs. Therefore, in my view the majority opinion would not be controlling if such claims were asserted in other litigation. Id. at 173 n.1 (Seitz, C. J., concurring).
 Romeo v. Youngberg, 644 F.2d 147, 178 (3d Cir. 1980).
 
 
 [11]
 Even if the Rennie record revealed that two or more modes of treatment were considered appropriate for Rennie, which it does not, I cannot help but observe that in the instant context, even that predicate appears to be faulty because it would require that acceptable, although differing, medical judgments must be measured by a constitutional standard
 As Chief Judge Seitz stated in his concurring opinion in Romeo, supra, an opinion in which I joined:
 In my view, the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.
 Id. at 178.
 For an interesting discussion of the least restrictive doctrine as applied to the mentally afflicted, see Hoffman & Foust, Least Restrictive Treatment of the Mentally Ill: A Doctrine in Search of Its Senses, 14 San Diego L.Rev. 1100 (1977). Among other admonitions expressed, the authors warn against the danger of elevating legal precepts above effective medical therapy. Id. at 1103-1105.
 
 
 [12]
 Manic depression is basically a mood disorder while schizophrenia is primarily a thought disorder characterized by delusions, hallucinations, and faulty logic. Manic depressives, however, may also display thought disorders at the manic end of the mood patterns whereas schizophrenia is characterized by sustained rather than episodic periods of thought disorder. 462 F.2d at 1139-1140
 
 
 [13]
 Rennie v. Klein, 462 F.Supp. 1131 (D.N.J.1978) and Rennie v. Klein, 476 F.Supp. 1294 (D.N.J.1979)
 
 
 [14]
 If despite its apparent disclaimer, the standard which the majority now announces does include constitutional and thus judicial oversight over least restrictive dosages and treatments, many of which are administered as often as four or more times a day, even Romeo from which the majority's present standard was derived would find such a standard unsuitable. Romeo itself stated:
 ... the application of a constitutional standard of "least intrusive alternative" on continuing treatment programs, which often involve qualitative medical determinations subject to daily, possibly hourly changes, would prove unworkable. The judiciary is not in a particularly advantageous position to determine which of two medications is less intrusive, nor especially competent in assessing present therapeutic benefits versus long-term consequences and side effects for each administration of a drug.
 Romeo, supra, at 166-67.
 
 
 [15]
 As the majority opinion recites, typescript at 3-6, Rennie's complaint was filed in 1976. At the district court level, three published opinions have been filed. The first was filed in response to Rennie's motion for a preliminary injunction. Rennie v. Klein, 463 F.Supp. 1131 (D.N.J.1978). The second, reported with the first, responded to a renewed motion for a preliminary injunction. Rennie v. Klein, 462 F.Supp. 1151 (D.N.J.1978). The third responded to the motion for a preliminary injunction on behalf of a certified class. Rennie v. Klein, 476 F.Supp. 1294 (D.N.J.1979). A panel of this court first heard the present appeal on April 22, 1980. The panel's opinion was circulated among the members of the court but its filing was withheld pending the filing of the court's en banc opinion in Romeo v. Youngberg, 644 F.2d 147 (3d Cir. 1980). See Romeo v. Youngberg, 644 F.2d 147, 186 (3d Cir. 1980) (Garth, J., concurring)
 Prior to that date, this court had reviewed, on appeal, Halderman v. Pennhurst, 612 F.2d 84 (3d Cir. 1979) (en banc ) rev'd and remanded, --- U.S. ----, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). We held that the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001-6081 (1976), required that the mentally retarded be habilitated in the least restrictive environment. Chief Judge Seitz, in his concurring opinion in Romeo v. Youngberg, 644 F.2d 147, 180 (3d Cir. 1980) succinctly characterized the distinction between environment and treatment:
 In short, even if least restrictive alternative analysis provides an appropriate framework for answering the question of where to place the mentally retarded, it is simply too rigid a tool once we leave that question and focus on conditions of care and habilitation within a particular institution. (emphasis supplied)
 As noted in text, the Supreme Court reversed Halderman calling into grave question the reliance which the Halderman majority had placed on a least restrictive analysis even where it only involved the long-term habilitation needs of the mentally retarded.
 The First Circuit's opinion in Rogers v. Okin, 634 F.2d 650 (1st Cir. 1980) cert. granted, --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981), involved essentially the same issue as this case, i. e., may a mentally diseased involuntarily committed patient, as distinct from a mentally retarded patient, refuse medication. The discussion in Rogers, which held that a patient could constitutionally refuse medication under certain circumstances briefly adverted to the relevance of "less restrictive alternatives." Rogers v. Okin, supra. The Supreme Court evidencing, in my opinion, its interest in the relevance of "least restrictive alternatives" in the care, treatment, and housing of both mentally retarded and mentally diseased patients, granted certiorari in both Rogers v. Okin, supra, and Romeo v. Youngberg, supra. It was against this background that this court considered en banc the present case, Rennie v. Klein, and the majority opinion adopted as part of its constitutional standard a least restrictive treatment test.
 
 
 [16]
 I note Justice Blackmun's uneasiness with the "least restrictive" test:
 I add these comments to record purposefully, and perhaps somewhat belatedly, my unrelieved discomfort with what seems to be a continuing tendency in this Court to use as tests such easy phrases as "compelling (state) interest" and "least drastic (or restrictive) means." ... And, for me, "least drastic means" is a slippery slope and also the signal of the result the Court has chosen to reach. A judge would be unimaginative indeed if he could not come up with something a little less "drastic" or a little less "restrictive" in almost any situation, and thereby enable himself to vote to strike legislation down. This is reminiscent of the Court's indulgence, a few decades ago, in substantive due process in the economic area as a means of nullification.
 Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89, 99 S.Ct. 983, 992-93, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring).
 
 
 [17]
 I deliberately do not define this latter standard, as it is not necessary to the determination here. My only purpose in referring to a constitutional standard of care is to make clear that the risk of permanent side effects is a question restricted to a standard of care, not a factor to be considered in the right to refuse treatment itself. Nevertheless, I observe that whatever the constitutional standard may be, it does not in this context include any "right" to the least restrictive form of treatment, for the reasons discussed in text supra
 In this connection, see also Romeo v. Youngberg, supra, pp. 173-81, (Seitz, C. J., concurring), which proposes as a constitutional standard, with which I agree:
 the defendants are liable if their conduct was such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment.
 Id. at p. 178.
 
 
 [1]
 Indeed, the Supreme Court has not foreclosed the possibility that institutional pressures or biases may disqualify a decision-maker; it has required impartiality and detachment and said that a staff physician will suffice "so long as he or she is free to evaluate independently" the evidence. Parham v. J.R., 442 U.S. 589, 607, 99 S.Ct. 2493, 2506, 61 L.Ed.2d 101 (1979); see also Wolff v. McDonnell, 418 U.S. 539, 559, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974); Morrissey v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972). In each of these cases, a district court finding that intramural administrators were fit to review decisions made by their subordinates was affirmed by the Court expressly on the record and not as a matter of law. See, e. g., Parham v. J.R., supra, 442 U.S. at 618, 99 S.Ct. at 2512; Wolff v. McDonnell, supra, 418 U.S. at 571, 94 S.Ct. at 2989. Accordingly, even were the injunction before us a permanent one, the question whether medical directors in New Jersey mental hospitals lacked the objectivity necessary to review the actions of their staff should be subject to the clearly erroneous standard of review
 Likewise, the Supreme Court has recognized that some provision for patient advocacy, such as the district court ordered in this case, may be the unavoidable price of due process when those persons whose liberty interest is threatened are particularly vulnerable or helpless. See Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Frowning on the adversariness implicit in such a decree, the opinion of the court vacates it in reliance upon Parham v. J.R.. The analogy is misplaced, however, since the doctors there served as a disinterested check on the decisions of parents affecting their children. In the context of involuntary drugging, however, the doctors are called upon to review the decisions of colleagues or subordinates within their institution.
 In the comparable context of Vitek v. Jones, the Court found the risk of error in determining a prisoner's need for compelled behavior modification treatment to be "substantial." Acknowledging that the inquiry involved was essentially medical, and that officials with medical, rather than legal training should make the decisions, the Court nonetheless responded that "(i)t is precisely '(t)he subtleties and nuances of psychiatric diagnoses' that justify the requirement of adversary hearings." 445 U.S. at 495, 100 S.Ct. at 1264, quoting Addington v. Texas, 441 U.S. 418, 430, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979). A majority of the justices agreed that due process under such circumstances required the provision of "independent assistance" to an inmate, so that his interests would be effectively advocated at the hearing. 445 U.S. at 498, 100 S.Ct. at 1266 (Powell, J., concurring).
 By discounting the need for independent decision-makers and patient advocates without regard to the risk of error demonstrated in the record, the opinion of this court seriously blunts the significance of the foregoing Supreme Court precedents.
 
 
 [2]
 Ancora Hospital reported that because of changes in response to the Rennie litigation, $100,000 was saved on medications in one year. Indeed, comparable savings in other hospitals might offset the cost of independent review and patient advocacy. See A.D. Brooks, The Constitutional Right to Refuse Antipsychotic Medications, 8 Bull.Am.Acad.Psychiat. & L. 179, 202 (1981)